**MENARD, INC., Appellant
(Plaintiff below),**

v.

**DAGE–MTI, INC., Appellee
(Defendant below).**

No. 46S03–0004–CV–00272.

Supreme Court of Indiana.

April 17, 2000.

Michael A. Wukmer, John J. Morse, Ice Miller Donadio & Ryan, Indianapolis, IN, Gene Jones, Mark Lienhoop, Newby Lewis Kaminsky & Jones, LaPorte, IN, Attorneys for Appellant.

Paul J. Peralta, D. Lucetta Pope, Baker & Daniels South Bend, IN, Attorneys for Appellee.

## ON PETITION TO TRANSFER

SULLIVAN, Justice.

Menard, Inc., offered to purchase 30 acres of land from Dage–MTI, Inc., for $1,450,000. Arthur Sterling, Dage's president, accepted the offer in a written agreement in which he represented that he had the requisite authority to bind Dage to the sale. The Dage board of directors did not approve and refused to complete the transaction. We hold that as president, Sterling possessed the inherent authority to bind Dage in these circumstances.

### Background

Dage–MTI, Inc., is a closely held Indiana corporation which manufactures specialized electronics equipment. At all times relevant to this appeal, Dage was governed by a six-member board of directors ("Board"), consisting of Ronald and Lynn Kerrigan, Louis Piccolo (a financial consultant retained by Ronald Kerrigan), Arthur and Marie Sterling, and William Conners. In addition to being a Board member, Arthur Sterling ("Sterling") had served as president of Dage for at least 20 years at the time of the trial on this mat-

ter. Of the six directors, only Arthur and Marie Sterling resided in Indiana.

For many years, Sterling operated Dage without significant input from or oversight by the Board. Over the course of the summer and early fall of 1993, however, Kerrigan took steps to subject Dage management to Board control. Kerrigan hired New York-based financial consultant and future Board member Piccolo to assess the company's performance. Kerrigan also retained New York attorney Gerald Gorinsky to represent his interests concerning Dage.

In late October of 1993, the Dage shareholders met in New Jersey to discuss an offer by Sterling to purchase the Kerrigans' shares of Dage. During the course of the meeting, Sterling first informed other directors that Menard, Inc., had expressed interest in purchasing a 30–acre parcel of land owned by Dage and located in the Michigan City area. Menard is a Wisconsin corporation that owns and operates home improvement stores in the Midwestern region of the United States.

On October 30, 1993, Menard forwarded a formal offer to Sterling pertaining to the purchase of 10.5 acres of the 30–acre parcel. Upon receipt of the offer, Sterling did not contact Menard to discuss the terms and conditions of the offer. Instead, on or about November 4, 1993, he forwarded the offer to all the Dage directors with a cover note acknowledging that Board approval was required to accept or reject the offer. Ultimately, this offer was rejected: Kerrigan, Piccolo, and Gorinsky determined that the offer should be rejected due to the collective effect of certain sections of the purchase agreement submitted by Menard, as well as co-development obligations that the offer imposed on Dage. This rejection was communicated to Sterling, and although he viewed the offer to purchase favorably, he let the offer lapse. Later, he informed Menard's agent, Gary Litvin, that members of Dage's Board objected to various provisions of the offer.

On November 30, 1993, Sterling called Kerrigan and informed him that Menard would make a second offer for the entire 30–acre parcel. Sterling presented a two-part proposed resolution ("consent resolution") to the Board: the first part authorized Sterling to "offer and purchase" another parcel located immediately to the north of the 30–acre parcel and referred to as the "Simon property"; the second part authorized Sterling to "offer and sell" the 30–acre parcel. Sterling, Kerrigan, Piccolo, and Gorinsky discussed the offer and Sterling was told to change the "offer and sell" provision to "to offer for sale." He was also instructed that he could purchase the Simon property on behalf of Dage, but could only "offer" the 30–acre parcel to Menard at a particular price. Additionally, Sterling was told that in soliciting offers for the 30–acre parcel, he was not to negotiate the terms of a sale. Gorinsky reminded Sterling that any offer from Menard would require Board review and acceptance, and he instructed Sterling to forward any offer to the Board for approval or rejection.

Finally, Sterling was told that if Menard submitted an agreement with the same objectionable provisions as the first offer, it would be rejected. Sterling agreed to follow the instructions of the Board "as long as I don't have to pay for" Gorinsky's and Piccolo's services in reviewing the offer. Based upon the discussion, Sterling drafted a new resolution, which stated that he was authorized "to take such actions as are necessary to offer for sale our 30 acre parcel ... for a price not less than $1,200,-000."

On December 6, 1993, Sterling informed Piccolo that Menard had agreed to make another offer. Piccolo reminded Sterling of his obligation to secure Board approval of the offer. Menard forwarded a second proposed purchase agreement to Sterling. This agreement contained the same provisions that the Board found objectionable in the first proposed agreement. However, this offer differed in that it was for the

purchase of the entire 30–acre parcel for $1,450,000.

During a week-long series of discussions beginning December 14, 1993, and unknown to any other member of the Dage Board, Sterling negotiated several minor changes in the Menard agreement and then signed the revised offer on behalf of Dage. Menard also signed, accepting the offer. Under Paragraph 5(c)(I) of the agreement, Sterling, as president of Dage, represented as follows: "The persons signing this Agreement on behalf of the Seller are duly authorized to do so and their signatures bind the Seller in accordance with the terms of this Agreement." (R. at 916; Finding of Fact No. 47.) (R. at 1144, 1149.) No one at Dage had informed Menard that Sterling's authority with respect to the sale of the 30–acre parcel was limited to only the solicitation of offers.

Upon learning of the signed agreement with Menard, the Board instructed Sterling to extricate Dage from the agreement. Later, the Board hired counsel to inform Menard of its intent to question the agreement's enforceability. However, it was not until March 29, 1994, that Dage first gave notice to Menard of this intent.

Menard ultimately filed suit to require Dage to specifically perform the agreement and to secure the payment of damages. Menard initially filed a motion for partial summary judgment, which was denied. Following a bench trial, the trial court ruled in favor of Dage. The Court of Appeals affirmed, finding that Sterling did not have the express or apparent authority to bind the corporation in this land transaction. *Menard, Inc. v. Dage–MTI, Inc.,* 698 N.E.2d 1227 (Ind.Ct.App.1998).

### Discussion

■ The trial court's judgment in this case is embodied in Findings of Fact and Conclusions of Law entered pursuant to Trial Rule 52(A). The findings or judgment are not to be set aside unless clearly erroneous, and due regard is to be given to the trial court's ability to assess the credibility of witnesses. *See* T.R. 52(A); *Shell Oil Co. v. Meyer,* 705 N.E.2d 962, 972 (Ind.1998), *reh'g denied.* In our review, we first consider whether the evidence supports the factual findings. *See id.; Estate of Reasor v. Putnam Co.,* 635 N.E.2d 153, 158 (Ind.1994), *reh'g denied.* Second, we consider whether the findings support the judgment. *See Shell Oil Co.,* 705 N.E.2d at 972; *Estate of Reasor,* 635 N.E.2d at 158. As we have noted several times in recent cases, while we defer substantially to findings of fact, we do not do so to conclusions of law. *See, e.g., Haseman v. Orman,* 680 N.E.2d 531, 533 (Ind. 1997); *State v. Van Cleave,* 674 N.E.2d 1293, 1295–96 (Ind.1996), *reh'g granted in part,* 681 N.E.2d 181 (Ind.1997). Here, we find that the evidence supports the trial court's findings of fact. However, its conclusions of law employed principles of *"actual authority"* and *"apparent authority"* when they should have employed principles of *"inherent authority."* A judgment is clearly erroneous if it relies on an incorrect legal standard. *Shell Oil Co.,* 705 N.E.2d at 972.

### I

■ Two main classifications of authority are generally recognized: "actual authority" and "apparent authority." Actual authority is created "by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Scott v. Randle,* 697 N.E.2d 60, 66 (Ind.Ct.App.1998), *transfer denied; see* Restatement (Second) of Agency §§ 7, 33 (1958). Apparent authority refers to a third party's reasonable belief that the principal has authorized the acts of its agent, *Pepkowski v. Life of Indiana Ins. Co.,* 535 N.E.2d 1164, 1166–67 (Ind.1989); it arises from the principal's indirect or direct manifestations to a third party and not from the representations or acts of the agent, *id.; Drake v. Maid–Rite Co.,* 681 N.E.2d 734, 737–38 (Ind.Ct.App.1997), *reh'g denied.*

On occasion, Indiana has taken an expansive view of apparent authority, including within the discussion the concept of "inherent agency power." *See Koval v. Simon Telelect, Inc.*, 693 N.E.2d 1299, 1301 (Ind.1998) (certifying answer to a federal court that retention of an attorney confers the inherent power on that attorney to bind the client to an in court proceeding); *Storm v. Marsischke*, 159 Ind. App. 136, 140–41, 304 N.E.2d 840, 843–44 (Ind.Ct.App.1973).[1]

■ " 'Inherent agency power is a term used ... to indicate the power of an agent which is derived *not* from authority, apparent authority or estoppel, but solely from the agency relation and exists for the protection of persons harmed by or dealing with a servant or other agent.' " *Koval*, 693 N.E.2d at 1304 (omission in original) (emphasis added) (Ind.1998) (quoting Restatement (Second) of Agency § 8A (1958)).[2] This " 'status based' ... [form of] vicarious liability rests upon certain important social and commercial policies," primarily that the " 'business enterprise should bear the burden of the losses created by the mistakes or overzealousness of its agents [because such liability] stimulates the watchfulness of the employer in selecting and supervising the agents.' " *In re Atlantic Fin. Management, Inc.*, 784 F.2d 29, 32 (1st Cir.1986) (second alteration in original) (quoting W. Seavey, *Handbook of the Law of Agency* § 91 (1964)), *cert. denied*, 481 U.S. 1072, 107 S.Ct. 2469, 95 L.Ed.2d 877 (1987). And while "representations of the principal to the third party are central for defining apparent authority," the concept of inherent authority differs and "originates from the customary authority of a person in the particular type of agency relationship so that no representations beyond the fact of the existence of the agency need be shown." *Cange v. Stotler & Co.*, 826 F.2d 581, 591 (7th Cir.1987) (citing Restatement (Second) of Agency § 161 cmt. b (1958)) (stating that the "plaintiff need not prove any actions on [defendant's] part besides its allowing [an employee] to act as its agent for handling plaintiff's account because the trier of fact could find [the employee's] statements within his inherent authority").

In *Cange*, the Seventh Circuit explained this concept's genesis:

Judge Learned Hand articulated this concept of inherent agency power when he upheld a jury verdict for plaintiff based on a contract the jury found to be an unconditional engagement for a singing tour despite the principal's instructions to its agent to engage the singer only for such recitals as he could later persuade record dealers to book her for, instructions which were not told to plaintiff. *Kidd v. Thomas A. Edison, Inc.*, 239 F. 405 (S.D.N.Y.), *aff'd*, 242 F. 923 (2d Cir.1917). He reasoned that the scope of an agency must be measured "not alone by the words in which it is created, but by the whole setting in which those words are used, including the customary powers of such agents" and thus the contract was enforceable because "the customary implication would seem to have been that [the agent's] authority was without limitation of the kind here imposed." *Id.* 239 F. at 406. The principal benefits from the existence of inherent authority because

---

1. Because "[i]t is possible to say that the rationale underlying the decision in [an 'apparent authority' case] is the same rationale underlying the principle of inherent agency power," *Storm v. Marsischke*, 159 Ind.App. 136, 140, 304 N.E.2d 840, 843 n.3 (Ind.Ct. App.1973), we find both issues properly before this Court. *See also Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 85 (3d Cir.) ("In many cases the same facts will support a finding of 'apparent' or 'inherent agency.' "), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960).

2. There are at least two relevant sections of the Restatement (Second) of Agency, which define the scope and extent of inherent authority as it relates to the facts of this case: § 8A (entitled, "Inherent Agency Power"), and § 161 (entitled, "Unauthorized Acts of General Agent").

"[t]he very purpose of delegated authority is to avoid constant recourse by third persons to the principal, which would be a corollary of denying the agent any latitude beyond his exact instructions." *Id.* 239 F. at 408; *see* Restatement (Second) of Agency §§ 8A comment a, 161 comment a (1958).

*Cange,* 826 F.2d at 590–91 (alterations in original).

█ We find the concept of inherent authority — rather than actual or apparent authority — controls our analysis in this case. Menard did not negotiate and ultimately contract with a lower-tiered employee or a prototypical "general" or "special" agent, with respect to whom actual or apparent authority might be at issue. Menard dealt with the president of the corporation, whom " ' "[t]he law recognizes ... [as one of] the officers [who] are the means, the hands and the head, by which corporations normally act." ' " *Community Care Ctrs., Inc. v. Indiana Dep't of Pub. Welfare,* 468 N.E.2d 602, 604 (Ind.Ct.App. 1984) (alterations added) (quoting *Fidelity & Casualty Co. v. Carroll,* 186 Ind. 633, 635–36, 117 N.E. 858, 859 (1917) (quoting in turn 2 Thompson, Corporations § 1387 (2d ed.1910))), *transfer denied*; *see also Burger Man, Inc. v. Jordan Paper Prods., Inc.,* 170 Ind.App. 295, 311–13, 352 N.E.2d 821, 831–32 (1976) ("When the president and general manager does an act within the domain of the general objects or business of the corporation, and within the scope of the usual duties of the chief officer, it will be presumed that he had the authority to do it, and whoever would assert the contrary must prove it."). In so finding, we consider significant the " ' "distinction ... between a corporate act, performed through the intermediation of a person specially empowered to act as its agent, and a like act done immediately by the corporation through its executive or administrative officers, which may be termed its *inherent agencies.*" ' " *Community Care Ctrs., Inc.,* 468 N.E.2d at 604 (emphasis added) (quoting *Fidelity & Casualty Co.,* 186 Ind. at 635–36, 117 N.E. at 859 (quoting in turn 2 Thompson, Corporations § 1387 (2d ed.1910))).

## II

█ Our determination that the inherent agency concept controls our analysis does not end the inquiry, however. The Restatement (Second) of Agency § 161 provides that an agent's inherent authority

> subjects his principal to liability for acts done on his account which [ (1) ] usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by the principal, [ (2) ] the other party reasonably believes that the agent is authorized to do them and [ (3) ] has no notice that he is not so authorized.[3]

Distilled to its basics, we find that Sterling had inherent authority here if: (1) first, Sterling acted within the usual and ordinary scope of his authority as presi-

---

**3.** The Restatement explains,

The rule in this Section ... [is an] important illustration[ ] of *inherent power*[ ], that is, power[ ] held by an agent, the exercise of which [is] effective to subject the principal to liability in transactions in which the agent has neither authority nor apparent authority, but in which the agent derives his power wholly from his relation with the principal. [It is] called *inherent agency power*[ ] since there is no other common designation which adequately describes [it]. Restatement (Second) of Agency § 161 cmt. a (1958) (emphases added). Relevant to the case before us is the observation that

if one appoints an agent to conduct *a series of transactions over a period of time,* it is fair that he should bear losses which are incurred when such an agent, although without authority to do so, does something which is *usually done in connection with the transactions he is employed to conduct. Id.* (emphases added). In this case, the Board positioned its corporate president, Sterling, to "conduct a series of transactions" with Menard concerning the sale of Dage real estate. We find this section of the Restatement applicable to this case.

dent;[4] (2) second, Menard reasonably believed that Sterling was authorized to contract for the sale and purchase of Dage real estate;[5] and (3) third, Menard had no notice that Sterling was not authorized to sell the 30–acre parcel without Board approval.[6] *See also Koval,* 693 N.E.2d at 1304 n. 7 (quoting Restatement (Second) of Agency § 161).

As discussed *supra,* the trial court entered findings of fact and conclusions of law pursuant to Ind. Trial Rule 52. Having accepted the findings of fact, we review them to see if they will support a finding that Sterling had the inherent authority as president to bind Dage in this transaction.

A

█ As to whether Sterling acted within the usual and ordinary scope of his authority as president, the trial court found that Sterling, a director and substantial shareholder of Dage, had served as Dage's president from its inception; had managed the affairs of Dage for an extended period of time with little or no Board oversight; and had purchased real estate for Dage without Board approval. (R. at 911, 912; Findings of Fact Nos. 7–9, 16.) However, the trial court reached the conclusion that "[t]he record persuasively demonstrates that the land transaction in question was an extraordinary transaction" for Dage, which manufactures electronic video products. (R. at 921; Conclusion of Law No.

11.) Thus, the court concluded that "Sterling was not performing an act that was appropriate in the ordinary course of Dage's business." *Id.*

We initially note that the Restatement looks at whether the acts "usually accompany or are incidental to transactions which *the agent* is authorized to conduct." Restatement (Second) of Agency § 161(emphasis added). On the other hand, our analysis of inherent agency in *Koval* was focused on whether " 'a general agent ... acted within the usual and ordinary scope of *the business* in which he was employed.' " 693 N.E.2d at 1304 (emphasis added) (quoting *Farm Bureau Mut. Ins. Co. v. Coffin,* 136 Ind.App. 12, 16, 186 N.E.2d 180, 182 (1962)) (concerning an attorney's inherent agency power in court proceedings). There is a difference.

█ The Restatement looks at the agent's office or station in the company to gauge the scope of the agent's authority, whereas our analysis in *Koval* looked to the purpose and scope of the business in which the general agent (i.e., attorney) was employed. We find the Restatement, which is focused "solely [on] the agency relation," is more appropriate in the current situation involving corporate officers, who are "natural persons who hold and administer the offices of the corporation." *Community Care Centers, Inc.,* 468 N.E.2d at 604.[7]

4. Section 8A puts forth a similar inquiry: Did the "general agent do[ ] something similar to what he is authorized to do, but in violation of orders[?]" Restatement (Second) of Agency § 8A cmt. b.

5. This inquiry into the third-party's "reasonable belief" is a broad-based inquiry into the scope of the agent's inherent authority in light of his or her agency relation with the principal.

6. This inquiry into the third-party's "notice" is a narrow inquiry focusing on the specific transaction.

7. Under a standard "apparent authority" analysis, we agree with the trial court and Court of Appeals that the land transaction in

question was an extraordinary transaction. *See, e.g., Tedesco v. Gentry Dev. Inc.,* 521 So.2d 717, 724 (La.Ct.App.1988) (declining to enforce a sales contract for land signed by the president of a corporation and concluding "that the doctrine of apparent authority is inappropriate in the realm of sales and mortgages of real estate" where the president only had the actual authority "to initially list the property," and he had not obtained approval from the board of directors to sell the corporation's "immovable property"), *aff'd,* 540 So.2d 960 (La.1989); *Willsey v. W.C. Porter Farms Co.,* 522 S.W.2d 29, 32–33 (Mo.Ct.App. 1975) (finding the president of a corporation did not have apparent authority to bind corporation to sell approximately 35% of its farmland, where no other activity but farming had ever been carried on by corporation and

Given that the trial court found that Sterling, as president of the company since its inception, had managed its affairs for an extended period of time with little or no Board oversight and, in particular, had purchased real estate for Dage in the past without Board approval, we conclude that Sterling's actions at issue here were acts that "usually accompany or are incidental to transactions which [he was] authorized to conduct." Restatement (Second) of Agency § 161.

### B

■ Next, we must determine whether Menard reasonably believed that Sterling was authorized to contract for the sale and purchase of Dage real estate. While Sterling's *apparent authority* to bind Dage was "vitiated" by Menard's knowledge that the sale of Dage real estate required Board approval, *see Menard, Inc.*, 698 N.E.2d at 1232, this information did not defeat Sterling's *inherent authority* as Dage president to bind the corporation in a "setting" where he was the sole negotiator, *see Cange*, 826 F.2d at 591.

Because the inherent agency theory "originates from the customary authority of a person in the particular type of agency relationship," *id.*, we look to the *agent's indirect or direct manifestations* to determine whether Menard could have "reasonably believe[d]" that Sterling was authorized to contract for the sale and purchase of Dage real estate. *Koval*, 693 N.E.2d at

1304 n.7.[8] And considering that the "agent" in this case is a general officer of the corporation (as opposed to an "appointed general agent" or "company general manager"), we find that Menard "should not be required to scrutinize too carefully the mandates of [this] permanent ... agent[ ] ... who [did] no more than what is usually done by [a corporate president[9]]." Restatement (Second) of Agency § 161 cmt. a.

Here, the facts establish that Menard reasonably believed that Sterling was authorized to contract for the sale and purchase of Dage real estate. We begin with the premise that " 'the acts of a corporation done through its officers are acts done per se.' " *Community Care Ctrs., Inc.*, 468 N.E.2d at 604 (emphasis omitted) (quoting *Fidelity & Casualty Co.*, 186 Ind. at 635–36, 117 N.E. at 859 (citing in turn 2 Thompson, Corporations § 1387 (2d ed.1910))). Next, we note that at all times "Sterling held himself out as president of Dage." (R. at 919; Finding of Fact No. 67.) In fact, "Sterling ha[d] served as president of Dage since its inception"; as noted in the preceding section, he was a substantial shareholder and member of the six-person Board of Directors; he had managed the affairs of Dage for an extended period of time with little or no Board oversight; and he had purchased real estate for Dage without Board approval. (R. at 911, 912; Findings of Fact Nos. 7–9, 16.) And although "early in the transaction, Sterling

thus contract to sell land was not usual and customary activity of corporation, and where purchasers were advised that land involved was owned by corporation and that approval of other members of corporation was necessary to validate contract).

8. This inquiry is in contradistinction to the test for apparent authority, which looks to the *principal's indirect or direct manifestations* to determine whether the third party could have reasonable believed that the principal had authorized the acts of its agent. *Pepkowski*, 535 N.E.2d at 1166–67.

9. Dage's By-laws are no different than those of most closely held corporations in that the president is vested with the formal authority

to execute most, if not all, documents binding the corporation. Relevant to the issue before us is Article V ("Officers of the Corporation"), Section 8 ("Execution of Documents"):

Unless otherwise provided by the board of directors, all contracts, leases, commercial paper and other instruments in writing and legal documents, shall be signed by the president and attested by the secretary. All bonds, deeds and mortgages shall be signed by the president and attested by the secretary. All certificates of stock shall be signed by the president and attested by the secretary.

(R. at 981.)

advised [Menard] that he was required to go back to his 'partners' to obtain authority to sell the entire thirty acres[, Sterling later] confirmed that he had the authority from his Board of Directors to proceed." (R. at 922–23; Conclusion of Law No. 19.)

We find it reasonable that Menard did not question the corporate president's statement that he had "authority from his Board of Directors to proceed" with the land transaction. *Id.*; *see Federal Sav. & Loan Ins. Corp. v. Shearson–American Express, Inc.*, 658 F.Supp. 1331, 1339 (D.P.R.1987) ("[T]he authority of an agent to do certain acts may reasonably be inferred from the continuity of the acts themselves."); *McIntosh v. Vector Properties, Inc.*, 889 P.2d 911, 914 (Okla.Ct.App. 1995) (finding that defendant corporation's actions led to plaintiff's reasonable belief that agent could bind corporation in commission-sharing agreement, where the president of the corporation knew that the agent was holding himself out as a vice-president and acknowledged that the agent, with the corporation's permission, had the authority to enter into the agreement); *R.H. Kyle Furniture Co. v. Russell Dry Goods Co.*, 340 S.W.2d 220, 225 (Ky. 1960) (finding that persons dealing with corporations through their managers or superintendents are justified in relying upon the apparent or implied authority of such agents).

We also find it reasonable for Menard not to scrutinize Sterling's personal "acknowledge[ment]" that he signed the agreement for the purchase and sale of the real estate by authority of Dage's board of directors." (R. at 919; Finding of Fact No. 67). We believe this especially to be the case where (1) Sterling himself was a member of the Board, (R. at 912; Finding of Fact No. 16); (2) the agreement contained an express representation that "[t]he persons signing this Agreement on behalf of the Seller are duly authorized to do so and their signatures bind the Seller in accordance with the terms of this Agreement," (R. at 916; Finding of Fact No. 47) (R. at 1144, 1149); and (3) Menard was aware that Dage's corporate counsel, Patrick Donoghue, was involved in the review of the terms of the agreement, (R. at 1133–34, 1141, 1391).

C

▮▮▮ Finally, we consider whether Menard had notice that Sterling was not authorized to sell the 30–acre parcel without Board approval. The record does not indicate that Menard was aware of the existence of the consent resolution, much less that it limited Sterling's authority as president. Nor was there evidence that either the Board or Sterling informed Menard that Sterling's authority with respect to the sale of the 30–acre parcel was limited to only the solicitation of offers. And, as discussed *supra*, Sterling personally acknowledged that he signed the agreement by authority of Dage's Board of Directors, of which he was a member.

▮▮▮ It is true, as the Court of Appeals noted, that Menard was advised early in the transaction that Sterling had to go to the Board to obtain approval. *Menard*, 698 N.E.2d at 1232 (citing Conclusions of Law Nos. 16–22). This knowledge would have vitiated the apparent authority of a lower-tiered employee or a prototypical general or special agent.[10] But we do

10. This is because an agent's apparent authority emanates not from the agency itself but from the *principal' s indirect and direct manifestations,* so that a third party is required under the rule of law to "use reasonable diligence and prudence to ascertain" the extent of any limitations of which he or she has become aware. *See* 3 Am.Jur.2d *Agency* § 83 (1986). On the other hand, an individual's inherent authority is derived from the *status of the office that he or she holds,* so that a third party is not "required to scrutinize too carefully" a knowledge or awareness that the officer's authority has possibly been limited. *See* Restatement (Second) of Agency § 161 cmt. a. Put differently, it is reasonable for a third party to assume that a corporate president (in this case, the chief executive officer) has obtained the requisite "board approval" to conduct a land transaction, absent the

not find it sufficient notice that Sterling, an officer with inherent authority, was not authorized to bind Dage at the closing.

The trial court found that Sterling signed the agreement with Menard during the week of December 14, 1993; that he represented in the agreement that he was authorized to sign it and that his signature bound Dage; and that when Dage's lawyers contacted Menard on March 29, 1994, it "was the first notice given by Dage to Menard that there was any issue regarding the enforceability of the agreement." (R. at 916, 919; Findings of Fact 46, 47, 63.) Indeed, Sterling wrote to Menard on February 7, 1994, indicating that Dage was performing as required by the agreement. (R. at 2059.) We conclude that Menard had no notice that the Board had limited Sterling's authority with respect to 30–acre parcel. *See, e.g., Avery v. Kane Gas Light & Heating Co.,* 403 F.Supp. 14 (W.D.Pa.1975) (finding the corporation bound by instruments signed by its president and treasurer despite bylaws denying such officers' authority where party dealing with the corporation had no actual notice of such bylaws); *Filter v. Vernonia,* 64 Or.App. 559, 669 P.2d 350 (1983) (determining that unless the principal has by some action given notice to third parties of the limitations on the agent's authority, a managing agent is presumed to have the authority to do those acts which managing agents normally do); *cf. Truck Crane Serv. Co. v. Barr–Nelson, Inc.,* 329 N.W.2d 824 (Minn.1983) (finding that where a third party had been notified in writing by the president of the corporation that the corporation denied liability for certain services, the third party was put on inquiry notice as to the authority of any corporate employee to countermand such a position); *Wachovia Bank v. Bob Dunn Jaguar, Inc.,* 117 N.C.App. 165, 450 S.E.2d 527 (1994) (holding that a vice-president lacks the authority to execute documents and thereby bind the corporation when the defendant corporation's president met with the

third party's actual and specific notice to the

plaintiff bank and informed it that no one other than the president may execute guaranties and that any guaranty required the president's approval and signature).

## D

▓▓▓ In *Koval,* this Court said: "if one of two innocent parties must suffer due to a betrayal of trust—either the principal or the third party—the loss should fall on the party who is most at fault. Because the principal puts the agent in a position of trust, the principal should bear the loss." *Koval,* 693 N.E.2d at 1304 (citing *Farm Bureau Mut. Ins. Co.,* 136 Ind.App. at 18, 186 N.E.2d at 183).

That maxim has particular resonance here. The record fails to reveal a single affirmative act that Dage took to inform Menard of Sterling's limited authority with respect to the 30–acre parcel, and the Board did not notify Menard that Sterling had acted without its authority until 104 days after it learned of Sterling's action. (R. at 917, 919; Findings of Fact Nos. 52, 63.) By this time, Sterling had taken additional steps to close the transaction. (R. at 918; Finding of Fact No. 56.) Dage's failure to act should not now form the basis of relief, penalizing Menard and depriving it of its bargain. *See Federal Savings & Loan Ins. Corp.,* 658 F.Supp. at 1340 ("Factors such as duty of care required to exercise a high standard of supervision and whether the employee was a high level officer or director of the firm are also relevant [in establishing an employer's vicarious liability under an agency theory].").

### Conclusion

We (1) grant transfer, (2) vacate the opinion of the Court of Appeals, and (3) remand to the trial court for further proceedings consistent with our conclusion that Dage was bound by Sterling's actions.

DICKSON and RUCKER, JJ., concur.

contrary.

SHEPARD, C.J., dissents with separate opinion.

BOEHM, J., not participating.

SHEPARD, Chief Justice, dissenting.

I think today's decision will leave most corporate lawyers wondering what the law actually is.

A board of directors authorizes the president to sell some real estate but requires that the sale be submitted to the board for approval or disapproval. The president understands that he must submit any sale to the board.[1] He tells the potential buyer that he must submit it.[2] The buyer knows that its offer must be submitted to the board after the president signs the sales agreement.[3] The agreement is in fact submitted to the board and disapproved. Our Court holds that the agreement is binding anyway.

The majority calls this "an expansive view of apparent authority." Op. at 1211. Facially, this seems like an understatement.

On the other hand, the Court embarks upon its discussion of "inherent authority," which it rightfully describes as a specie of apparent authority, after endorsing the conclusions of the trial court and Court of Appeals that the corporation's president did not possess apparent authority to sell the land without board approval.[4]

In the end, it is difficult to know how lawyers will advise their clients after today's decision. Where all parties to a corporate transaction understand that board approval is required and that it may or may not be forthcoming, the black letter law cited in today's opinion points toward a conclusion that the buyer's offer was not accepted by the seller.

While I agree with the general legal principles laid out by the majority, those principles seem undercut by the resolution of this case.

---

1. "Piccolo reminded Sterling of his obligation to secure Board approval of the offer." Op. at 1209.

2. "It is true, as the Court of Appeals noted, that Menard was advised early in the transaction that Sterling had to go to the Board to obtain approval. *Menard,* 698 N.E.2d at 1232 (citing Conclusions of Law Nos. 16–22)." Op. at 1215.

3. The majority leans heavily, op. at 1210, 1215, 1216, on a recitation in the sales agreement to the effect that "The persons signing this Agreement on behalf of the Seller are duly authorized to do so and their signatures bind the Seller in accordance with the terms of this Agreement." (R. at 1149.) This same language appeared in the first sales agreement submitted to the Board and disapproved. (R. at 1000, "The persons signing this Agreement....") If this recitation plays the central legal role the majority ascribes to it, it seems that the first sales agreement is the one we should be litigating. Sensibly, no one has suggested that the earlier document constituted a binding agreement.

4. As the Court of Appeals said, Sterling's apparent authority "was vitiated by Menard's knowledge that Sterling had to go to the board to obtain approval." *Menard,* 698 N.E.2d at 1232 (citing Conclusion of Law No. 22).