**GALLANT INSURANCE COMPANY,**
Appellant–Plaintiff,

v.

**Christina ISAAC and Loretta Davis,**
Appellees–Defendants.

No. 49A02–0001–CV–56.

Court of Appeals of Indiana.

Aug. 14, 2000.

Thomas R. Harper, Kopka, Landau & Pinkus, Indianapolis, Indiana, Attorney for Appellant.

Mark R. Smith, Smith Fisher & Maas, Robert D. Epstein Epstein & Frisch, Indianapolis, Indiana, Attorneys for Appellees.

## OPINION

RILEY, Judge

### STATEMENT OF THE CASE

Plaintiff–Appellant, Gallant Insurance Company (Gallant), appeals from the trial court's grant of summary judgment in favor of Defendants–Appellees, Christina Isaac (Isaac) and Loretta Davis (Davis) (hereinafter referred to collectively as "Insured"), on its complaint for declaratory judgment regarding its insurance coverage of Isaac's accident.

We affirm.

### ISSUE

Gallant raises several issues for our review which we consolidate and restate as one dispositive issue: whether the trial court properly granted summary judgment in favor of the Insured, finding that Gallant's insurance coverage of Isaac's vehicle was in full force and effect on December 3, 1994.

### FACTS AND PROCEDURAL HISTORY

■ We recite the facts and draw inferences from the evidentiary matter designated at trial in the light most favorable to Gallant, against whom summary judgment was entered. *See Harvest Life Ins. Co. v. Getche,* 701 N.E.2d 871, 874 (Ind.Ct.App. 1998), *reh'g denied, trans. denied.*

Thompson–Harris is an independent insurance agent. Its authority includes the power to bind Gallant on new insurance policies, as well as interim policy endorsement such as adding a new driver, or changing and adding a vehicle insured under a policy. Although no written agreement describes the relation between Gal-

lant and Thompson–Harris, the Record indicates Gallant became bound to provide insurance coverage at the time and date on which Thompson–Harris faxed or called the required information to Gallant's producing agent, and premiums were paid to Thompson–Harris.

On June 2, 1994, Gallant issued automobile insurance coverage on Isaac's 1986 Pontiac Fiero through its independent agent, Thompson–Harris. Thompson–Harris provided Isaac with a printed quote for liability insurance coverage, by Gallant only. That same day, Isaac decided to apply for coverage with Gallant through Thompson–Harris. Isaac signed a pre-application checklist as the "applicant" and the insurance agent counter-signed the same document as "agent." The printed application form, which had been filled out by the agent, showed that Isaac's coverage was bound as of 2:06 p.m. on June 2, 1994 until December 2, 1994.

The policy issued by Gallant had "CONDITIONS" regarding "Policy Period" and "Premium." (R. 51). The policy applied only to accidents, occurrences, and losses during the policy period. The holder of the policy could only renew it by making premium payments to Gallant on or before the effective date of the successive policy period. If such payment was not made, the policy terminated at the end of the policy period. With regard to "CHANGES" made to its conditions, the policy states that an agent shall not waive or change any part of the policy, except by endorsement issued to form a part of the policy, which is signed by a duly authorized representative of the company. (R. 52). The policy also stated that the written policy embodied all agreements existing between the insured, the company and all agents relating to the insurance.

On the last day of her insurance coverage, Isaac traded her 1986 Pontiac Fiero for a 1988 Pontiac Grand Prix. To obtain the newly purchased car, the financing bank required Isaac to obtain full coverage on it. That same day, Isaac contacted Thompson–Harris to notify it that she was purchasing the new car, and to discuss enhancing the existing insurance policy to meet bank requirements. Isaac told a Thompson–Harris employee that she must obtain "full insurance coverage" as a condition to receiving a loan. She also told the employee at Thompson–Harris that her current coverage expires on December 3, 1994, the next day.

In response, the Thompson–Harris employee informed Isaac that because their agency was about to close for the weekend, she would immediately "bind" coverage on the 1988 Grand Prix. They decided that Isaac would come in to Thompson–Harris on Monday, December 5, 1994, to complete the paperwork and pay the down payment on the premium. The employee also informed Isaac that the new coverage on her Pontiac Grand Prix would include the same coverage existing from her Pontiac Fiero, along with additional coverage to comply with conditions set by the bank.

The next day, on December 3, 1994, a different employee completed the "Personal Policy Change Request." This form deleted the 1987 Pontiac Fiero from Isaac's Policy and replaced it with the 1988 Pontiac Grand Prix. It also added additional coverage to the policy as well as additional loss payee/lienholder. The Personal Policy Change Request listed the "Agency" and "Producer" as Thompson–Harris, and stated that the "effective date of change" was December 3, 1994. Towards the bottom of the form, the Thompson–Harris employee typed "[s]he will be in at 9:00 a.m. Monday, 12/5/94, to [sic] down [sic] on renewal. What is [sic] new rate? Thanks." (R. 380). This form, which requested the listed changes, was faxed to Insurance Brokers of Indiana, Inc., on December 3, 1994.

On December 4, 1994, while driving her Pontiac Grand Prix, Isaac collided with another car in which Davis was a passenger. The next day, as planned, Isaac went to Thompson–Harris and paid $133.00

down payment on the new insurance policy. She also reported the accident. Thompson–Harris completed an "Indiana Operator's Vehicle Crash Report," which notified the State Police that Isaac had insurance coverage at the time of the accident, on December, 4, 1994. Thompson–Harris completed that form on behalf of Gallant. Later, on or about December 22, 1994, Gallant renewed Isaac's insurance policy, with an effective period of December 6, 1994 to June 6, 1995.

Soon afterwards, Gallant brought its complaint for declaratory judgment regarding its insurance coverage of Isaac's accident. It sought a judgment that stated Gallant was not liable for any losses incurred because the policy was not in force. In response, Isaac and Davis each filed motions for summary judgment. The trial court ruled on all three motions on May 18, 1999. The trial court's general findings read as follows:

1. The Plaintiff, Gallant Insurance Company's, Motion for Summary Judgment is overruled.

2. The Defendants', Christina Isaac and Loretta Davis, Motion for Summary Judgment are granted.

3. The Court finds that no genuine issue of material fact exists and that the Defendant, Christina Isaac and Loretta Davis, are entitled to Summary Judgment as a matter of law.

(R. 470). On August 20, 1999, Davis filed her Motion to certify the trial court's summary judgment as a final judgment, which the trial court granted. Gallant now appeals.

### DISCUSSION AND DECISION

Gallant contends that Isaac's insurance coverage had lapsed at the time Isaac's accident occurred because the policy renewal premium was not paid as dictated in the policy. It is undisputed that Thompson–Harris is Gallant's independent insurance agent. However, Gallant insists that Thompson–Harris had no authority to renew the insurance policy or orally contract

in a manner contrary to what the policy states without the approval of Gallant's producing agent, Insurance Brokers of Indiana, Inc. We disagree.

### I. *Standard of Review*

■ The trial court's decision on summary judgment enters appellate review clothed with a presumption of validity. *See Harvest Life Ins. Co.*, 701 N.E.2d at 874. Nevertheless, summary judgment is improper when genuine issues of material fact exist and the moving party is not entitled to judgment as a matter of law. *See id.* On summary judgment review, an appellate court applies the same standard and undertakes essentially the same inquiries as the trial court. *See id.* We consider all designated evidence in the light most favorable to the non-moving party, and determine whether a genuine issue of material fact existed and whether the trial court correctly applied the law. *See id.*

■ In the case at bar, the trial court entered a *general finding* that Isaac's Insurance policy was in full force and effect on December 4, 1994. A general finding is merely "a finding in favor of one party and against another, ... [so] the reviewing court will affirm the judgment of the trial court if it is sustainable upon any legal theory which is supported by the evidence." *Neterer v. Slabaugh*, 548 N.E.2d 832, 833–834 (Ind.Ct.App.1990) (*citing* Harvey, Indiana Practice sec. 52.6 (2nd ed.1988)), *trans. denied.* Because we find evidence to support the trial court's summary judgment that Thompson–Harris, as an agent of Gallant, acted within its scope of authority by renewing the policy, we affirm on that issue alone.

### II. *Thompson–Harris had the Inherent Authority to Bind Gallant*

Gallant argues that Thompson–Harris had no actual or apparent authority to renew the insurance policy or orally contract to do so. Specifically, Gallant contends that it, as a principal, did not mani-

fest any act toward Thompson–Harris or Isaac, whether directly or indirectly, that may have granted such authority. However, because we find that neither an actual nor apparent authority theory applies to the particular facts of this case, we instead address *sua sponte* Thompson–Harris's authority to act as Gallant's agent under an inherent authority theory.

■ Inherent agency power indicates the power of an agent that is derived not from authority, apparent or estoppel, but from the agency relation itself. *See Menard, Inc. v. Dage–MTI, Inc.,* 726 N.E.2d 1206, 1211 (Ind.2000). This inherent authority theory exists for the protection of persons harmed by or dealing with a principal's servant or agent. *See id.* Our supreme court has recently reminded us about inherent agency power and its underlying purpose by stating:

> This "status 'based' ... [form of] vicarious liability rests upon certain important social and commercial policies," primarily that the " 'business enterprise should bear the burden of the losses created by the mistakes of overzealousness of its agents [because such liability] stimulates the watchfulness of the employer in selecting and supervising the agents.'" And while "representations of the principal to the third party are central for defining apparent authority," the concept of inherent authority differs and "originates from the *customary authority of a person in the particular type of agency relationship so that no representations beyond the fact of the existence of the agency need be shown.*"

*Id.* (citations omitted) (emphasis added).

■ Inherent authority exists to hold an agent's principal liable when the acts in question (1) usually accompany or are incidental to transactions which the agent is authorized to conduct, even though they are forbidden by the principal;[1] (2) the third party believes that the agent is authorized to do them; (3) and that third party has no notice that the agent is not so authorized. *See id.* at 1212 (*quoting* Restatement (Second) of Agency sec. 161 cmt. a (1958)). In *Menard,* the president of a corporation accepted an offer in a written agreement after he represented contrary to explicit instruction by the board that he had the requisite authority to bind his corporation to the sale. *See id.* at 1208. The court found that the president had inherent authority, and bound the corporation, because each element of the three-part inquiry was satisfied. *See id.* at 1216.

As in *Menard,* sufficient undisputed evidence exists in the Record to find that Thompson–Harris had inherent authority to renew Isaac's insurance policy and bind Gallant.

### A. *Usual and Ordinary Scope of Agent's Authority*

■ With regard to *Menard's* first element, a court inquires into whether the agent did something similar to what he is *authorized* to do, but in violation of orders. *See id.* at 1213. To decipher what is actually authorized, the court looks at the agent's office or station and focuses solely on the agency relation. *See id.* In *Menard,* the president violated explicit instruction by the Board to not enter into any sale or purchase agreement before he secured their approval. *See id.* at 1214. The president negotiated and sold the real estate in question. *See id.* The court found that the corporation's president acted within the usual and ordinary scope of his authority as president, because "he had managed [ ] [the corporation's] affairs for an extended period of time with little or no Board oversight and, in particular, had purchased real estate for [ ][it] in the past without Board approval ..." *See id.*

---

1. Relevant to the case before us is the court's observation in *Menard* stating: "if one appoints an agent to conduct a series of transactions over a period of time, it is fair that [ ] [the principal] should bear the losses which are incurred when such an agent, although without authority to do so, does something which is usually done in connection with the transaction he is employed to conduct." *Menard,* 726 N.E.2d at 1212 (*citing* Restatement (Second) of Agency sec. 161 cmt. a (1958)).

In the case at bar, Thompson–Harris's renewal of Isaac's insurance policy constitutes an act which usually accompanies or is incidental to insurance transactions that it is authorized to conduct. Examining Gallant and Thompson–Harris's agency relation reveals that, as an agent, Thompson–Harris *was authorized to bind Gallant* on new insurance policies, as well as interim policy endorsements, such as changing and adding new drivers, or changing or adding the vehicle insured. (R. 373–74, 573–77). For example, Thompson–Harris "had authority to write an application." (R. 373). That application "had to be either called to [Insurance Brokers of Indiana, Inc.] or faxed to them to bind coverage." (R. 374). In general, the power to bind its principal came into being once Thompson–Harris faxed the necessary paperwork to Gallant's producing agent and payment was made. (R. 374, 573–74, 576–77).

Thompson–Harris also had a common practice of telling its insured that they were "bound" despite not receiving payment until later, violating instructions by Gallant and provisions found in the policy. (R. 51, 374). For example, the Record indicates that Thompson–Harris would "orally tell the insured that the new schedule vehicle was bound for coverage." (R. 374). Thompson–Harris would then relay that communication on to Gallant, which would then issue the endorsement. (R. 374). We conclude that this common practice of binding coverage verbally, in violation of Gallant's orders, is similar to Thompson–Harris's authorized conduct, given expressly by Gallant, to bind coverage by fax or phone. Therefore, we find that Thompson–Harris acted within the usual and ordinary scope of its authority.

### B. *Third Party's Reasonable Belief*

Next, as to the second element enunciated in *Menard*, a court looks to the *agent's* direct and indirect manifestations and determines whether the third party could have reasonably believed that the agent had authority to conduct the act in question. *See id.* at 1214 (citing *Koval v. Simon Telelect, Inc.*, 693 N.E.2d 1299, 1304 (Ind.1998)). "This inquiry into the third-party's 'reasonable belief' is a broad based inquiry into the scope of the agent's inherent authority in light of his or her agency relation with the principal." *Id.* at 1213. In *Menard*, the court found that the third party, the purchaser, could have reasonably believed that the corporation's president, as the agent, was authorized to contract for the sale of the real estate. *See id.* Although the purchaser knew the real estate sale "required Board approval, ... [ ] [that] information did not defeat [ ] [the agent's] inherent authority as ... president to bind the corporation in a 'setting' where he was the sole negotiator ..." *Id.* at 1214. (citations omitted). Furthermore, an article found in the corporation's By-laws that qualified the president's authority and limited him to what the Board approves of also did not defeat that inherent authority. *See id.* Because the agent was a general officer of the corporation who did nothing more than what is usually done by a corporate president, not only was the purchaser's belief justified, but also the purchaser was not required to scrutinize too carefully the mandates of the president. *See id.*

Here, Isaac could have reasonably believed that Thompson–Harris had authority to orally bind coverage. Isaac's past dealings were all through Thompson–Harris, whether involving payment of premiums, changing or including a driver, or requesting a new estimate. Direct communication between Gallant and Isaac never occurred. Thus, it was reasonable for Isaac to take at face value Thompson–Harris's communication that coverage was bound, and that she could come in at the end of the weekend to pay for the policy renewal. The reasonableness of Isaac's belief is bolstered by the fact that Thompson–Harris completed all the paperwork necessary and faxed the "Personal Policy Change Request," requesting at the bottom of the page an estimate and noting that Isaac will be in on December 5th, after the weekend, to pay.

Although in *Menard*, the purchaser knew that the board had to ratify any agreement before it was finalized, in our case Isaac had no reason to second guess a direct communication by Thompson–Harris stating coverage was bound, particularly since that was a common practice of Thompson–Harris. Moreover, the dictates of the insurance policy, which limited Thompson–Harris's authority, resemble the limitations in *Menard's* By-laws. As in *Menard*, the written limitations in our case do not alter Thompson–Harris's inherent authority to bind Gallant when Thompson–Harris defies its principal's instructions and clearly states to the third party that coverage is bound. As such, we find that Thompson–Harris's direct and indirect manifestation over time, and its direct verbal communication to Isaac that coverage was bound, lead Isaac to reasonably believe that Thompson–Harris had the authority to renew the insurance policy.

### C. *Notice that Agent was not Authorized*

■ Finally, the third element of *Menard* inquires into whether the third party had notice that the agent was not so authorized. *See id.* at 1212. "This inquiry into the third-party's 'notice' is a narrow inquiry focusing on the specific transaction." *Id.* at 1213. In *Menard*, the record did not indicate whether the purchaser was aware of a consent resolution in the corporation's By-laws, much less that it limited the president's authority. *See id.* at 1215. The purchaser was also not aware that the Board, through direct verbal communications, limited the president's authority to the solicitation of offers regarding the sale of the property. However, as mentioned earlier, the purchaser knew that the Board must approve the sale before the agreement was finalized. *See id.* Still, the court found such knowledge insufficient "notice that [ ] [the president], an officer with inherent authority, was not autho-

rized to bind [ ] [the corporation] at the closing." *Id.* at 1215–1216. Our supreme court concluded its analysis by reiterating, "if one of two innocent party's must suffer due to a betrayal of trust ... the loss should fall on the party ... most at fault. Because the principal puts the agent in a position of trust, the principal should bear the loss." *Id.* at 1216 (citing *Koval*, 693 N.E.2d at 1304).

■ In the case at bar, Isaac lacked notice that Thompson–Harris did not have authority to verbally bind coverage. Similar to *Menard*, the Record fails to indicate whether Isaac was aware that Thompson–Harris had limited authority. It does not mention whether Isaac knew of expressed limitations about the authority of Thompson–Harris to bind insurance coverage without actual payment. Moreover, although in *Menard*, the purchaser *knew* that the board had to ratify any agreement by the president to sell the land, *See id.* at 1215, in our case Isaac had no reason to know that when Thompson–Harris bound coverage Gallant must still endorse that verbal binding.[2] Therefore, we find Isaac did not have notice that Thompson–Harris was not authorized to verbally bind coverage, without payment.

Lastly, we note, as in *Menard*, that one affirmative act by Gallant may have altered this conclusion. *Menard*, 726 N.E.2d at 1216. If Gallant or its producing agent *informed* insured individuals or potential clients that Thompson–Harris could not verbally bind coverage, or if Thompson–Harris was required to give such notice, Gallant would have satisfied the notice requirement. Instead, however, Thompson–Harris was left unsupervised to establish common practice in violation of Gallant's granted authority.

### *CONCLUSION*

■ As in *Menard*, Gallant and Isaac are two innocent parties who have suffered

---

2. The Record indicates that had that knowledge been available to Isaac, she would have "gone to another insurance agent who could bind coverage so that [ ][she] would be able to satisfy the Fifth Third Bank's requirement that [ ][she] obtain 'full insurance coverage' on the 1988 Pontiac Grand Prix." (R. 324).

due to Thompson–Harris's betrayal of trust. Thompson–Harris was not authorized to verbally bind coverage without first receiving payment. Gallant, however, is the business enterprise better situated to "bear the burden of the losses created by the mistakes" of Thompson–Harris's overzealousness. *Menard,* 726 N.E.2d at 1211. Such liability may stimulate Gallant's watchfulness in selecting and supervising its agents, as well as taking affirmative acts to avoid mishaps as we witnessed here. *See id.* As such, we find that *Menard's* three-part test was satisfied in this case, and we conclude that the Record supports the trial court's findings that Isaac's insurance policy was in full force and effect on December 3, 1994, because Thompson–Harris had the inherent authority to bind coverage by Gallant verbally.

Affirmed.

KIRSCH, J, and BAKER, J., concur.