## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 26 2019, 9:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Preeti Gupta
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Dustin Woodard, <br> *Appellant-Respondent,* <br><br> v. <br><br> Ashley Woodard, <br> *Appellee-Petitioner.* | June 26, 2019 <br><br> Court of Appeals Case No. <br> 18A-DR-3119 <br><br> Appeal from the Morgan Circuit Court <br><br> The Honorable Matthew Hanson, Judge <br><br> Trial Court Cause No. <br> 55C01-1003-DR-330 |

**Riley, Judge.**

# STATEMENT OF THE CASE

[1] Appellant-Respondent, Dustin Woodard (Father), appeals the trial court's denial of his motion to modify custody and for the appointment of a Guardian *ad Litem* (GAL).

[2] We affirm.

# ISSUES

[3] Father presents two issues on appeal, which we restate as the following:

    (1) Whether the trial court abused its discretion by denying Father's motion to modify custody; and

    (2) Whether the trial court abused its discretion by denying Father's request for the appointment of a GAL.

# FACTS AND PROCEDURAL HISTORY

[4] On November 23, 2010, Father and Appellee-Petitioner, Ashley Woodard (Mother), divorced. Two sons were born of the marriage: D.W. and J.W. (collectively, Children) born in 2005 and 2006, respectively. The divorce decree ordered joint legal custody of the Children, with Mother having primary physical custody. Father was ordered to pay weekly child support of $55.

[5] On April 18, 2018, Father filed an Emergency Motion to Modify Custody and Motion for Appointment of a GAL. Father alleged that Mother was exposing the Children to recurring instances of domestic violence in the home; Mother's

live-in boyfriend, Eddie Nalley (Nalley) drank alcohol every day in front of the Children; Mother was not giving D.W. his ADHD medication correctly; and that the appointment of a GAL would be in the best interest of the Children.

[6] On November 1, 2018, the trial court conducted an evidentiary hearing. Father, Mother, and Nalley testified. At the time of the hearing, Mother was married to Nalley. Father alleged that he had received several Facebook messages from the Children stating that Mother and Nalley drank alcohol "every night" and got into altercations. (Transcript Vol. II, p. 5). Father claimed that in early April 2018, the Children were awakened from their sleep by Mother and Nalley fighting. Father claimed that Mother received a black eye from that altercation. Father also alleged that whenever the Children visited, he detected that the Children were not very well fed and lacked clean laundry at Mother's home. Father also alleged that Mother and Nalley would at times tell D.W., who had "acne," that he was "ugly" and "stupid." (Tr. Vol. II, p. 10).

[7] Regarding the black eye incident, Mother testified that she "got hit in the face" while playing football with Nalley while the Children were at school. (Tr. Vol. II, p. 14). Nalley testified that he felt "awful" when the football hit Mother squarely "in the nose, and blacked both of her eyes." (Tr. Vol. II, p. 16). Nalley testified that he cooks dinner every night, that he goes to the store almost every day, and that there was plenty of food in Mother's house. Nalley testified the Children helped with their laundry, and that he and Mother assisted whenever necessary. At the close of the hearing, the trial court

indicated that it would like to conduct an in-camera interview with the Children. On November 9, 2018, the trial court interviewed the Children to determine their wishes regarding custody. Thereafter, on December 3, 2018, the trial court entered its order denying Father's modification request and the request for the appointment of a GAL.

[8] Father now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Modification of Custody*

#### A. *Standard of Review*

[9] Child custody modifications are reviewed for an abuse of discretion, and we grant latitude and deference to our trial judges in family law matters. *Miller v. Carpenter*, 965 N.E.2d 104, 108 (Ind. Ct. App. 2012). On appeal, we neither reweigh the evidence nor reassess witness credibility. *Id*. Rather, we consider only the evidence most favorable to the judgment and the inferences flowing therefrom. *Id*.

[10] Here, the trial court entered findings of fact pursuant to Indiana Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. Ind. Trial R. 52(A); *Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000). In our review, we first consider whether the evidence supports the factual findings. *Menard*, 726 N.E.2d at 1210. Second, we consider whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either

directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard*, 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. T.R. 52(A). While we defer substantially to findings of fact, we do not do so to conclusions of law. *Menard*, 726 N.E.2d at 1210. We do not reweigh the evidence; rather, we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind. 1999).

[11] We note that Mother has failed to file an appellee's brief. In such a situation, we will not undertake the burden of developing arguments for Mother. *Cox v. Cantrell*, 866 N.E.2d 798, 810 (Ind. Ct. App. 2007), *trans. denied*. We apply a less stringent standard of review, and we may reverse the trial court's decision if the appellant can establish *prima facie* error. *Id*. *Prima facie* means "at first sight, on first appearance, or on the face of it." *Id*.

### B. *Modification*

[12] Father claims that the trial court abused its discretion by denying his motion to modify custody of the Children. Pursuant to Indiana Code section 31-17-2-21, a trial court may not modify a child custody order unless modification is in the child's best interests and there is a substantial change in one of the several factors. Indiana Code Section 31-17-2-8 provides that the factors relevant to a custody order are as follows:

> (1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a *de facto* custodian . . .

[13]     All that is required to support custody modification under Section 31-17-2-21 is a finding by the trial court that (1) change would be in the child's best interests, (2) a consideration of the factors listed above, and (3) a finding that there has been a substantial change in one of those factors. *In re Paternity of P.R.*, 940 N.E.2d 346, 351 (Ind. Ct. App. 2010).

[14]     On appeal, Father alleges that a substantial change has taken place regarding statutory factors four and seven as set forth in Indiana Code section 31-17-2-8. On factor four, the interaction and interrelationships of the child with the child's parent or parents, the child's siblings, and any other person who may significantly affect the child's best interests, the trial court entered the following pertinent finding:

> (D) the [c]ourt finds that Mother and Father are both remarried. The [c]ourt finds that there is some friction between the [C]hildren and Mother's husband, [] Nalley. There is no evidence of friction between the children and Father's wife.

(Appellant's App. Vol. II, p. 13). Father does not challenge this finding. Instead, he argues that the trial court should have found that a substantial change had occurred when Mother dressed D.W. in a Nazi costume for Halloween. He adds that Mother's actions were offensive, considering he has people in his "family who are Jewish, Hispanic[,] and Black." (Appellant's Br. p. 8). Because Father has not challenged the propriety of the above finding upon which the trial court could have relied to reject his request to modify custody, we interpret his contentions as requests to consider evidence contrary

to the judgment and reweigh the evidence and findings, which we cannot do. *See Yoon*, 711 N.E.2d at 1268.

[15] On factor seven, evidence of a pattern of domestic or family violence by either parent, the trial court entered the following finding

> (G) [] Father alleges domestic or family violence in Mother's home, pointing out that he saw Mother with a black eye. Mother and her husband testified that the black eye was the result of Mother's failed attempt to catch a football. The [c]ourt finds that, although there is arguing in Mother's home, which includes arguing between the adults and between the adults and children, this does not rise to the level of being characterized as domestic or family violence.

(Appellant's App. Vol. II, p. 13) (internal citations omitted). In his brief, Father contends that

> The behaviors that have been occurring in Mother's home are not isolated instances. Again, there were several instances of family violence that were presented at the November 1st hearing, and probably at the in-camera hearing[]. Because there was a pattern of family violence by the Mother, the trial court should have modified custody.

(Appellant's Br. p. 8). At the evidentiary hearing, Mother refuted claims of violence in her home, and she stated that the black eye was the result of her failed attempt to catch a football. Also, we note that the trial court conducted an in-camera interview with the Children, and the results of that interview are not part of the record.

[16] Father's argument on this factor consists of him directing our attention to evidence that supports his position and attempting to discredit the evidence relied upon by the trial court. This amounts to a repeated request that we reweigh the evidence and assess witness credibility, which we will not do. *See Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002) (cautioning that with respect to custody modifications, appellate courts "are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence"). In the instant case, Mother denied the presence of physical violence in her home, and she offered her own testimony describing how her blackened eye resulted. The trial court saw Mother and Father as witnesses, observed their demeanor, scrutinized their testimony as it came from the witness stand, and conducted an in-camera interview with the Children. *See Tompa v. Tompa*, 867 N.E.2d 158, 163 (Ind. Ct. App. 2007). As such, we conclude that the above finding relating to the domestic violence was not erroneous.

## II. *Appointment of a GAL*

[17] Father argues that the trial court abused its discretion by denying his motion for the appointment of a GAL. Dwelling on his claim that domestic violence was present in Mother's home, Father asserts, "[i]t is doubtful that the trial court [] could have done an adequate job of investigating these allegations with an [in-camera] interview. A GAL would have done a much more thorough

investigation of the allegations and the GAL would have issued a neutral and comprehensive report." (Appellant's Br. p. 8).

[18] Indiana Code Section 31-17-6-1 provides that a trial court may appoint a GAL, a court appointed special advocate, or both, for a child at any time. Father notes correctly that the statute places the decision within the trial court's discretion. *See Gilbert v. Gilbert*, 7 N.E.2d 316, 323 (Ind. Ct. App. 2014); *In re B.C.S.*, 793 N.E.2d 1054, 1060 (Ind. Ct. App. 2003). The purpose of such an appointment is to protect the best interests of the child. I.C. § 31-17-6-3.

[19] Here, the trial court made the following conclusion in its order: "After careful consideration of the evidence presented by the parties . . . The [c]ourt, therefore, DENIES Father's Emergency Motion to Modify Custody and Motion for Appointment of [GAL]." (Appellant's App. Vol. II, p. 13). Considering Mother's and Father's testimony—*i.e.*, they were both committed to protecting the Children's best interests—the trial court concluded that the appointment of a GAL was not necessary. Under the circumstances of the present case, we do not believe the trial court abused its discretion in failing to appoint a GAL.

## CONCLUSION

[20] Based on the foregoing, we conclude that the trial court did not abuse its discretion by denying Father's motion to modify custody. Also, we hold that the trial court did not abuse its discretion by denying Father's request for the appointment of a GAL.

[21] Affirmed.

[22]    Bailey, J. concurs

[23]    Pyle, J. concurs in result with separate opinion

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Dustin Woodard,<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Ashley Woodard,<br><br>*Appellee-Petitioner.* | Court of Appeals Case No.<br>18A-DR-3119 |

**Pyle, Judge, concurring in result**

[24] I concur in the result reached by my colleagues, but I write separately to commemorate the seventy-fifth anniversary of D-Day. At 6:00 a.m. of June 6, 1944, some 4,400 ships and landing craft, carrying 154,000 American, British, Canadian, and Polish troops, landed with 1,500 tanks, supported by some 11,000 aircraft to oust the Nazi scourge in Europe. THE OXFORD COMPANION TO UNITED STATES HISTORY 174 (Paul S. Boyer ed., Oxford University Press 2001). Among many atrocities, the Nazi regime was responsible for a

"genocidal program to exterminate European Jews"; a program which oversaw the murder of some 6 million Jews. *Id*. at 43; *The Holocaust Resource Center FAQs*, Yad Vashem: The World Holocaust Remembrance Center (6/14/2019). By the end of World War II, American battle deaths "totaled 292,131, with an additional 115,185 deaths from other causes." *Id*. at 846. "Total military and civilian deaths in the conflict have been estimated at fifty million." *Id*. at 847. I salute those who served and sacrificed.

[25] In this case, the trial court had the opportunity to weigh the evidence and evaluate the credibility of the witnesses. However, it must be noted that Father introduced evidence that Mother had dressed their son in a Nazi soldier's uniform for Halloween. When the trial court asked her if she had any objection to the admission of the photographs, she stated, "No. I don't see nothing [sic] wrong with it." Tr. 7. In light of the tremendous sacrifice of our men and women in uniform defeating the Nazi regime (our enemy), the following proverb should breathe new relevance into our collective decision-making: Just because you can do something does not mean you should.

[26]