**MAYFAIR INVESTMENT CORP., a Delaware corporation, and IB 17, LLC, Appellants–Plaintiffs,**

**v.**

**Wallace Patterson BRYANT, et al., Appellees–Defendants.**

**No. 49A02–0805–CV–398.**

Court of Appeals of Indiana.

March 8, 2010.

Michael J. Lewinski, Abigail Cella, Ice Miller LLP, Indianapolis, IN, Attorneys for Appellants.

Marvin Mitchell, Mitchell Hurst Jacobs & Dick, LLP, Indianapolis, IN, Attorney for Appellees.

1. IB 17, LLC is the current tenant on the ground leases for the Illinois Building, all of which are set to expire in 2018. Mayfair Investment Corp. is a 25% Class B member of IB 17, LLC. The managing member of IB 17, LLC is HDG Investments, LLC (owning 25% of IB 17, LLC as a Class A member), which is wholly-owned by HDG Mansur Capital Group, LLC. The remaining 50% ownership of IB 17, LLC is owned by Illinois Building, L.P. as a Class C member. Mayfair is a 59% limited partner in Illinois Building, L.P., and HDG Investments, LLC is a 1% general partner. The other 40% ownership of Illinois Building, L.P. is by Illinois Street Building

## OPINION

BROWN, Judge.

Mayfair Investment Corp. and IB 17, LLC[1] ("Mayfair" and "Mansur," respectively, and collectively, "Appellants") appeal the trial court's judgment ordering physical partition of property owned by Mayfair and by certain descendants of John and Evaline Holliday (collectively, the "Holliday Heirs"[2]). Appellants raise one issue, which we revise and restate as whether the trial court's judgment ordering physical partition of the property was clearly erroneous. We affirm.

The relevant facts follow. On April 24, 1919, John and Evaline Holliday, as lessors, entered into a ninety-nine year ground lease with L. Strauss & Co. for a parcel of land in downtown Indianapolis, Marion County, Indiana, ("Tract I") described as follows:

> Beginning at the Northwest corner of [Lot One (1) in Square Fifty-five (55) in the City of Indianapolis], thence running South on and along the East line of Illinois Street, forty-five (45) feet to a point, thence East parallel with Market Street, eighty (80) feet to a point, thence North forty-five (45) feet to the South line of Market Street, thence West along the South line of Market Street to the place of beginning.

Partnership, L.P. of which Mayfair is a 2.5% special limited partner and a 19.7472% additional limited partner, and HDG Investments, LLC is a 7.5% general partner and a 17.8161% limited partner.

2. The Holliday Heirs are: Wallace Patterson Bryant; Robert G. Bryant; Katherine D. Kane; Carol F. Holliday; Cristina Cornelia Macbeth; Benjamin Charles Rhodehamel; Isabelle Lornzi c/o Lucia E. Rhodehamel; Lucy W. Scanlon; Alexander R.H. Walling; Janet Holliday Welliver; and Janet Holliday Welliver, Trustee.

Appellants' Appendix at 487. Tract I is composed of approximately 3,600 square feet and is one of three tracts (individually identified as, "Tract I," "Tract II," and "Tract III") that underlie the Illinois Building, a ten story office building which was built in 1926 (Tracts I, II, III and the Illinois Building collectively, the "Unified Property"). In 2018, at the expiration of the ground leases,[3] the Illinois Building will revert to the owners/lessors of the three tracts. Tract I comprises 28.07 percent of the total area underlying the Illinois Building; Tracts II and III comprise the other 71.93 percent, or 9,225 of the total 12,825 square feet. Mayfair is the owner of Tracts II and III.

Beginning in 1991, Mansur began attempts at acquiring the Holliday Heirs' interests in Tract I. On September 30, 1998, Nancy Root, another descendant of John and Evaline Holliday, sold her one-sixth interest in Tract I to Mansur.[4] At some point, Mayfair acquired this one-sixth interest from Mansur.

On January 20, 2006, Mayfair filed a "Petition to Compel Partition of Real Property." *Id.* at 22. Mayfair's complaint sought "partition by sale as a parcel of real estate" for all of Tract I. *Id.* at 39. On October 17, 2006, the trial court granted Mayfair's motion to amend their complaint and add Mansur as a party plaintiff. On August 7, 2007, the trial court granted Appellants' motion for partial summary judgment and ordered that "Mayfair is entitled to an order of partition." *Id.* at 58. However, the trial court left the issue of whether to partition the parcel by sale or by physical partition "until the parties

request a hearing to resolve the issues or enter a stipulation." *Id.* at 59. On December 20, 2007, the Appellants' complaint was again amended, adding other parties who were subsequently dismissed.

On February 29, 2008, a hearing was held on the issue. The Appellants called two witnesses who each testified to the effect that "if [Mayfair] were to be awarded ... six hundred square feet [5] ... as compared to receiving the sale proceeds of [Mayfair's] percentage interest in [Tract I], that there would be less value received via the division of ... this six hundred square foot piece as compared to those sale proceeds." Transcript at 77; *see also id.* at 184. The Appellants' first witness, Julie Christensen, who was an employee of Mansur, testified regarding the potential damage to Mayfair were the court to order physical partition. Specifically, Christensen testified:

> One thing is that there would be significantly more investors and buyers in the market that would be interested in a thirty-six hundred square foot tract just because of the useability [sic] of it, the ability to put a number of uses on that tract. I, and brokers that I know in the market, as I understand it, would find it very difficult to use a six hundred square foot tract in downtown Indianapolis. Uses would be very limited.

*Id.* at 78. Christensen also testified that "[t]he six hundred feet, even if adjacent to [Tracts II and III], still wind up with a parcel in total ... that is not a square, rectangular shaped parcel. That adds additional complexity which, in my mind, is of

---

3. Tracts II and III are also subject to ground leases which are set to expire in 2018.

4. Specifically, the one-sixth interest was sold to the Illinois Building, L.P. Much like IB 17, LLC, the Illinois Building L.P. is considered a "Mansur entity," managed by HDG Invest-

ments, LLC. Again, Mayfair is listed as a 59% limited partner in the Illinois Building, L.P.

5. The six hundred square feet number was arrived at because Mayfair owns one-sixth of Tract I's 3,600 square feet, which equals six hundred square feet.

lesser value as well." *Id.* at 85. Christensen also testified that while she believed that there would be "some damages," she could not give a value to that damage amount. *Id.* at 90–91.

The Appellants also called Jeff Henry, a realtor with thirty-five years of experience. Henry testified that he had not "seen a lot of demand through the years" for six hundred square foot parcels of land, and that "[t]here's just not that many users or that much demand for six hundred square feet. It's very difficult, particularly if we're talking about taking a piece of ground and building a building. It's just not very practical." *Id.* at 179–180. Henry also testified that he had not made a determination as to the amount of damages that would be incurred by Mayfair by a physical partition of Tract I.

The Holliday Heirs called as a witness Michael Lady, who works as the managing director of a real estate appraisal and consulting firm. Lady testified that Tract I "could be partitioned without any damage" to Mayfair or the Holliday Heirs. *Id.* at 220. Lady testified that the owners of Tract I would not incur any harm or damage were it to be physically partitioned because "there wouldn't be a change in the highest and best use of the land if it were divided from what it is today. Highest and best use is that use which is going to bring the highest return if the property sold." *Id.* at 226. Regarding the actual six hundred square feet that might be physically partitioned from Tract I, Lady testified that because the highest and best use will be in the parcel's "assemblage

value,"[6] and that therefore "[t]hey're valuing it on a square foot basis," the actual six hundred feet partitioned out of the Holliday Heirs' portion Tract I is irrelevant.[7] *Id.* at 245. Lady testified, as to the usability of a potential six hundred foot parcel, as follows:

> Well, it'd still be subject to a lease, they would still get one-sixth of the income, they would still get the right of one-sixth of the reversion of the building, and it would still—if anybody wanted to put this together at the end of the lease term and create a redevelopment site— it would still be a key part of the redevelopment site.

*Id.* at 237.

Lady also testified that if the court ordered a sale of Tract I, and if that sale had the characteristics of a "forced sale," Lady believed that the "one-sixth interest of a forced sale would probably be less than the one-sixth strip." *Id.* at 221. Lady testified that "typically a forced sale would indicate that [a piece of property is] going to sell for less than market value" because a court-ordered sale does not involve a willing seller. *Id.* at 234. On cross examination, Lady testified that the danger of a court-ordered sale could be minimized as long as the seller had the right to set a minimum bid price.

Evidence was also presented on the values of the various land interests. Evidence was presented that an appraisal for the date of January 24, 2006, determined the fair market value of Tract I to be $670,000. The appraisal also determined

6. Lady defined "assemblage value" as "when several pieces are put together to create something that's more desirable, and usually you create value by putting the pieces together." Transcript at 227.

7. Lady also testified that he believed that the six hundred square feet should be partitioned

out "adjacent to [Tract II]" because "the owners of [Tract II] are the owners of this one-sixth interest. It would increase their holdings and it would also leave a separate parcel without a donut or without a hole in it for the Holliday [Heirs]." Transcript at 243.

the Unified Property's "hypothetical fee simple market value, assuming the subject site and current improvements are unencumbered by the existing lease" to be $6,070,000. Lady testified that this $6,070,000 figure represented the Unified Property's value should the ground lease be terminated. Lady described the valuation procedure for arriving at the $6,070,000 figure as follows:

> [T]he valuation procedures that were in play during the appraisal, which are the correct and proper procedures of valuation, have already discounted this value tremendously. They've discounted it because there's a below market lease that has ten years remaining on the lease, or twelve point two five years, and they've discounted it because it's a partial interest underneath a bigger building with different ownerships. And so they've discounted it down by using a discount rate of eleven percent and then taking forty percent off the reversion value. And that's about as pretty high as discounting as you can get.... [Y]ou wouldn't discount it any more than that....

*Id.* at 236–237. The undiscounted appraisal value for the Unified Property was $11,643,000.[8]

On April 4, 2008, the trial court ordered physical partition of Tract I. The trial court attached a diagram depicting Mayfair's six hundred square foot portion of Tract I which adjoined Tract II. The Holliday Heirs remained the owners of the remaining 3,000 square feet of Tract I. Each party held their new parcel "free and clear of any claims" of the other party. Appellants' Appendix at 17. The trial court entered the following findings and conclusions, among others:

> 11. Mayfair would suffer no damage by reason of an in kind division because the value of Mayfair's 16–2/3% tenant-in-common interest is equal to the value of a part of [Tract I] equal to 16–2/3% of the land area provided it adjoins [Tract II], and it is also equal to 16–2/3% of the market value of all of [Tract I].

> 12. The highest and best use of [Tract I], or any part of [Tract I], is assemblage and the assemblage value applies to the entire [Tract I] as well as to any subparts. In fact, the assemblage value is the most significant characteristic of value with any part of Tract I.

> \* \* \* \* \* \*

> 14. Although the Court would typically appoint a commissioner(s) to determine whether Tract [I] can be physically divided without damage to the owners, in this case the parties stipulated that the

---

8. There was also evidence presented by the Holliday Heirs of a letter of intent from Todd Maurer received by Mansur in January 2006 to purchase the Unified Property for $8,000,000. The Holliday Heirs argued that, had this deal been entered into, the Holliday Heirs would have been entitled to $1,872,000. The Holliday Heirs were not told of the offer, and they were "shocked and dismayed" when they learned of it. Transcript at 292. A subsequent $7,500,000 letter of intent by Maurer was made for the Unified Property on August 10, 2007. In his testimony the Holliday Heirs representative, William Rhodehamel, explained:

> We, the Holliday Heirs, felt that one possible resolution to this issue would be for the Illinois Building and [Tracts] I, II, and III to form a unified ownership under a third party. And so we encouraged Mr. Maurer, if he continued to have an interest in the property, to submit another offer to Mayfair in order to see if there was any interest on their part in moving forward with a third party and unifying ownership in that way. *Id.* at 293. Rhodehamel also testified that he did not believe Mayfair ever responded to Maurer's offer.

Court should make that determination. . . .

\* \* \* \* \* \*

16. No damage would occur to the owners from an in-kind division.

17. A forced sale of the property would likely deprive the Holliday [Heirs] of the assemblage value of their share of [Tract I]. Since Mayfair owns the other two tracts of land under the Illinois Building, an in-kind division of [Tract I] with Mayfair being allocated a share adjacent to its other land will preserve the value of Mayfair's share of [Tract I] and not deprive the Holliday Heirs their share of the assemblage value of their portion of [Tract I].

*Id.* at 15–16. Also, the trial court noted that "[t]he Holliday [Heirs] have elected to have their shares treated as a unit and request that a partition in kind occur with their share being treated as one unit. They would, therefore, continue as tenants-in-common as to 5/6th of Tract I." *Id.* at 17. No damages were awarded to either party.

■ The sole issue is whether the trial court's judgment ordering physical partition of Tract I was clearly erroneous. Here, the trial court entered findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52(A).[9] We may not set aside the findings or judgment unless they are clearly erroneous. *Buck v. Grube*, 833 N.E.2d 110, 113 (Ind.Ct.App.2005) (citing *Menard Inc. v. Dage–MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind.2000), *reh'g denied*). In our review, we first consider whether the evidence supports the factual findings. *Id.* Second, we consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Id.*

(quoting *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind.1996)). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.* at 113–114. We give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* at 114. While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.* (citing *Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind.1999)).

Indiana's statutes governing partition of real estate permit any person holding land as a joint tenant or tenant in common to petition the trial court to bring an action to compel partition. Ind.Code § 32–17–4–1 (2004). Ind.Code § 32–17–4–4(d) provides that:

If:

(1) upon trial of any issue;

(2) upon default; or

(3) by confession or consent of parties;

the court determines that the land for which partition is demanded cannot be divided without damage to the owners, the court may order the whole or any part of the premises to be sold as provided under section 12 of this chapter.

The partition statutes also provide that, in determining whether the land can be partitioned, the trial court "shall appoint three (3) individuals as commissioners," who issue a report to the trial court regarding whether the land can be divided and, if it is divided, how it should be accomplished. Ind.Code § 32–17–4–6, –7, –9 to –11 (2004). If the commissioners report that "the whole or part of the land which partition is demanded cannot be divided without damage to the owners, the

---

9. A request for specific findings was made by the Holliday Heirs.

court may order the whole or any part of the land to be sold at public or private sale on terms and conditions prescribed by the court." Ind.Code § 32–17–4–12(a) (2004). We have also recognized that the trial court "may determine whether land is susceptible to partition without the appointment of commissioners." *Buck*, 833 N.E.2d at 114 (citing *Crumrine v. Crumrine*, 77 Ind.App. 76, 77, 131 N.E. 230, 230–231 (1921)).

The Appellants argue that "evidence concerning Tracts II and III should not have been used to determine the issue of whether Tract I could have been divided without damage to the owners of Tract I." Appellants' Brief at 14. The Appellants argue that "[e]vidence concerning adjacent parcels of property that are separately owned and not at issue is irrelevant and immaterial." *Id.* at 11. The Appellants argue that in its judgment, the trial court relied on the doctrine of "assemblage," and applied the doctrine "as defined by Lady," who "testified that the highest and best use for Tract I is assemblage or using Tract I as part of Tracts II and III and 'even beyond those properties.'" *Id.* at 18 (quoting Transcript at 247) (footnote omitted). The Appellants argue further that "Indiana has not specifically recognized the doctrine of right of assemblage." *Id.* at 16 (citing *Tornatta Investments, LLC v. Ind. Dep't of Transp.*, 879 N.E.2d 660, 664 n. 1 (Ind.Ct.App.2008), *trans. denied*). The Appellants argue that they "presented evidence that the number of buyers for Tract I would be greater than the number of buyers for 600 square feet of Tract I." *Id.* at 24. Thus, The Appellants argue, "the concept of 'assemblage' as applied to Tract I only, actually supports a sale of the entire Tract I, not a physical division of Tract I, which only results in a further fragmentation of the property." *Id.* at 18.

The Holliday Heirs argue that the Appellants would not be damaged by physical partition because "there wouldn't be a change in the highest and best use.... [T]he highest and best use of [Tract I], or any parts of [Tract I], is for assemblage for a larger development." Appellees' Brief at 21. The Holliday Heirs also argue that regardless of the weight given to the conflicting evidence presented at the hearing, the trial court "still has discretion in ordering a sale." *Id.* The Holliday Heirs argue that there was no evidence presented "as to what the amount of loss would be [to Mayfair] from a physical division...." *Id.* at 22. The Holliday Heirs argue that:

> [T]he focus [of the judgment] was on Tract I and the relevance of adjacent property was its effect on the value of Tract I and its subparts. The assemblage value factor for Tract I is not any different from the court considering other matters bearing on value such as the neighborhood, the state of the commercial real estate market, and the physical condition of the property.

*Id.* at 24–25. The Holliday Heirs argue that Tract I's value, as represented by its highest and best use, is intertwined with its relationship with the Illinois Building, specifically the fact that "if the Illinois Building and other land were to be redeveloped again Tract I would need to be dealt with [,]" and that this value is equally preserved in Mayfair's six hundred square foot portion created by the trial court's judgment. *Id.* at 26–27. Thus, the Holliday Heirs contend that the Appellants were not damaged by the trial court's decision to physically partition Tract I rather than order a sale.

 "Generally speaking, a partition proceeding is an equitable one, in which the court has great flexibility in fashioning relief for the parties." *Hay v. Hay*, 885 N.E.2d 21, 24 (Ind.Ct.App.2008). "In a

partition proceeding, the rights of the parties, whether legal or equitable, are equally within the cognizance and protecting power of the courts." *Pavy v. Pavy*, 121 Ind.App. 194, 196, 98 N.E.2d 224, 225 (1951); *see also Milligan v. Poole*, 35 Ind. 64, 68 (1871). The ultimate goal of any partition proceeding is for a partition that is equitable to the parties involved, and we have recognized "the authority of trial courts ... to go beyond the express provisions of the partition statutes in order to accomplish an equitable division." *Culley v. McFadden Lake Corp.*, 674 N.E.2d 208, 212 (Ind.Ct.App.1996). "[P]articular deference is given to the judgment of the trial court where the proceeding sounds in equity and judgments in equity are clothed in a presumption of correctness." *Indiana Lawrence Bank v. PSB Credit Services, Inc.*, 706 N.E.2d 570, 572 (Ind.Ct.App. 1999), *trans. denied.* However, we recognize the maxim of equity that "equity follows the law," meaning that "an equitable right cannot be founded on a violation of law." *Hardy v. Hardy*, 910 N.E.2d 851, 856 (Ind.Ct.App.2009) (internal quotations omitted).

We observe that the statute favors land partitions by physical partition, and that "[a] trial court may order a sale of land, rather than a partition, only when it determines that the land cannot be partitioned without damage to the owners." *Culley*, 674 N.E.2d at 212; *see also Bryan v. Yoder*, 225 Ind. 57, 63, 71 N.E.2d 474, 477 (1947) ("The primary purpose of partition is to divide the property in kind...."); Ind.Code § 32–17–4–12. Indeed, "even faced with the possibility the land might be worth less if divided, the trial court still [has] discretion to order a division rather than a sale." *Gibbs v. Kashak*, 883 N.E.2d 825, 828 (Ind.Ct.App.2008).

We have previously recognized the discretion the trial court possesses in fashioning a remedy in partition proceedings. In *Culley*, this court stated:

> For example, the court has recognized the commissioners' power to create an easement or impose a servitude on the land, *Long v. Schowe*, 181 Ind. 13, 103 N.E. 785, (1914), and to consider advancements. *Scott v. Harris*, 127 Ind. 520, 27 N.E. 150 (1891). Additionally, our courts have recognized the trial court's authority to exercise similar equitable powers to settle disputes between parties to a partition proceeding, including ordering an accounting between the parties, *Peden v. Cavins*, 134 Ind. 494, 34 N.E. 7 (1893), reforming a mortgage, *Conyers v. Mericles*, 75 Ind. 443 (1881), and awarding compensation for improvements in land. *Willett v. Clark*, 542 N.E.2d 1354 (Ind.Ct.App. 1989).

*Culley*, 674 N.E.2d at 212 (footnote omitted). In *Culley*, we relied upon these authorities in holding that the trial court had the power to award owelty, or "a sum of money paid by one cotenant to another when land cannot be equally divided among the cotenants in a partition proceeding without impairing the value of all the parties' interests." *Id.* at 210, 212.

Then, in *Gibbs v. Kashak*, we affirmed the trial court's order of physical partition of a forty-acre tract owned by two siblings. *Gibbs*, 883 N.E.2d at 829. In *Gibbs*, the trial court was presented with evidence that the per-acre value of the tract was higher were the entire tract to be sold, rather than were the tract to be divided physically into two parcels. *Id.* at 827. The trial court ordered the land to be physically divided, finding "that no damage will be done to the property, except for the possible value per acre, by the partition." *Id.* Thus, the issue in *Gibbs* was whether, in light of the evidence presented pertain-

ing to per-acre land value, the trial court's order was clearly erroneous. *Id.* at 828.

The *Gibbs* trial court was presented with two reports which both "concluded selling the property as a whole would maximize the value." *Id.* at 828 n. 1. However, the reports "also indicated it was possible and fair to divide the property." *Id.* "Thus, the commissioners presented the trial court with two viable options—selling or dividing—depending on whether money or other concerns were given paramount importance." *Id.* In affirming the trial court, we held:

> We believe the trial court's order effectively addresses these concerns by giving Sally first choice of the parcels. Jack testified he was willing to take any portion of the property and has apparently accepted that he may not be able to use his landing strip or the house where he currently lives. Sally wants to sell her half and is not interested in using the buildings or the landing strip.

The testimony established a buyer would likely not use the buildings and would want a maximum number of dry acres to build on. Presumably, Sally will choose the half that has the least amount of water, leaving Jack, who enjoys nature, with the majority of the wetlands. Sally may choose the portion of the land that will be most attractive to buyers, and is not harmed by any lack of evidence regarding how the land should be divided. Therefore, we affirm the court's order dividing the property.

*Id.* at 829 (footnote omitted). Thus, the *Gibbs* court reaffirmed the wide discretion given to trial courts in determining a fair and equitable partition.

■■■■ Here, the trial court determined, based on the circumstances, that physical partition would not damage the owners of Tract I because the highest value of any specific segment is tied to its participation in the Unified Property.[10]

---

10. The parties both argue about the "doctrine of the right of assemblage" and whether it may be applied in this case. The doctrine of right of assemblage has been defined as follows: "[w]here the highest and best use of separate parcels involves their integrated use with the lands of another, such prospective use may be properly considered in fixing the value of the property if the joinder of the parcels is reasonably practicable." *Tornatta*, 879 N.E.2d at 664 (quoting *Clarmar Realty Co. v. Redevelopment Auth. of the City of Milwaukee*, 129 Wis.2d 81, 383 N.W.2d 890, 893 (1986) (quoting 4 Sackman, Nichols on Eminent Domain 12.3142(1) (3d ed.1978))). The Appellants argue that "Indiana has not specifically recognized the doctrine of right of assemblage." Appellants' Brief at 16. The Holliday Heirs on the other hand argue that "[c]ontrary to Mayfair's claim[,] assemblage value is recognized under Indiana law." Appellees' Brief at 28 (citation omitted).

The right of assemblage has been discussed in the context of an eminent domain proceeding in *City of Indianapolis on Behalf of Dep't of Metro. Dev't v. Heeter*, 171 Ind.App. 119,

355 N.E.2d 429 (Ind.Ct.App.1976). In eminent domain proceedings, the fact-finder "is charged with the duty of determining the fair market value of the condemned real estate." *Heeter*, 171 Ind.App. at 125–126, 355 N.E.2d at 433. The Indiana Supreme Court has defined fair market value as "what the land may be sold for on the date of the taking if the owner were willing to sell. Anything affecting the sale, value at that time is a proper matter for the [fact-finder's] consideration...." *Id.* at 126, 355 N.E.2d at 433. The court held that:

> We are of the opinion that if the highest and best use of a parcel of land can be made only in combination with other parcels and that the adaptability of such condemned property depends on this combination, then such adaptability may properly be considered by the jury in determining the amount of damages if the possibility of such combination is reasonably sufficient to affect the market value.

*Id.* at 127, 355 N.E.2d at 434.

In this case, the suit was not an eminent domain proceeding, and the trial court in its role as fact-finder was not asked to make a

Specifically, the trial court found that "[o]n the basis of the forgoing," including that Tract I, along with Tracts II and III, all lie beneath the Illinois Building, a ten-story office building located at a major intersection in downtown Indianapolis, the owners of Tract I would not be damaged and therefore physical partition was warranted. Appellants' Appendix at 17.

The record also reveals that an appraisal in 2006 determined the value of Tract I, comprising 28.07 percent of the ground beneath the Illinois Building, to be $670,000. That same appraisal determined the fair market value of the Unified Property to be $6,070,000.[11] And, there is evidence in the record that in 2018, the ninety-nine year ground leases will expire, and the Illinois Building will revert to the land-owners, including the owner(s) of Tract I. Thus, were the ground leases to have ended at the time of the appraisal, Tract I's value would have been $1,703,849. We find that there was ample evidence in the

record indicating that the highest value of Tract I, or any portion thereof, was linked to its position in the Unified Property, and therefore the trial court's determination that the owners of Tract I would not be damaged by physical partition was not clearly erroneous.

The Appellants essentially argue that the trial court should have examined the impact of physical partition of Tract I in a vacuum and not account for the fact that the Illinois Building sits atop it. The Appellants argue that the trial court should have looked only at whether a six hundred square foot parcel was less valuable than the proceeds of its share from the sale of the entire 3,600 square feet comprising Tract I, and that the Appellants presented evidence showing that to be the case. The Appellants do not cite to any authority, however, for the proposition that the trial court could not consider the entire circumstances affecting the land in making its determination.[12]

determination of fair market value for Tract I. As we noted in *Tornatta*, the doctrine of the right of assemblage has been applied only "to determine the fair market value of property *after* the determination has been made that a taking has occurred." *Tornatta*, 879 N.E.2d at 664 (emphasis in original). Consequently, the doctrine of the right of assemblage is inapplicable. However, that fact does not lead to the conclusion that the trial court is prohibited from considering the circumstances in determining whether the various owners of Tract I would be damaged by physical partition. Indeed, we believe that the trial court's use of the term "assemblage" in its judgment was a description or a characterization of one of the circumstances affecting Tract I, not the strict application of the "doctrine of the right of assemblage."

11. Also, there is evidence in the record showing that in 2006 Mansur received an $8,000,000 offer for the Unified Property.

12. Indeed, the authorities cited by the Appellants simply do not stand for the proposition. *See* Appellant's Brief at 13–14 (citing *Sch.*

*Corp. of Town of Russellville v. Russellville Lodge No. 141 Free and Accepted Masons*, 140 Ind. 422, 425, 39 N.E. 549, (1895) (finding that the applicable partition statute authorizes partition actions only "among persons holding lands as joint tenants or tenants in common"); *Anderson Sch. Twp. v. Milroy Lodge of Free and Accepted Masons*, 130 Ind. 108, 108, 29 N.E. 411, 412 (1891) (holding that an agreement granting appellee the right of ingress to and egress from its part of a building could not be deprived and therefore partition could not "be effected without destroying that right ..."); *Kitchen v. Sheets*, 1 Ind. 138, 138 (1848) (holding that compelling the partition of two different tracts of land by one suit was error where the cotenants of the different tracts were not the same); and *Burford v. Burford*, 182 Ind.App. 640, 643, 396 N.E.2d 394, 396 (1979) (holding that, where one cotenant of one parcel filed suit against his cotenants of that parcel, as well as the owners of a contiguous parcel upon which a building was erected over both parcels, the cotenant could force partition by sale only among his cotenants and could not compel partition by sale of the contiguous parcel)).

■ While the parties presented conflicting evidence regarding Tract I's susceptibility of physical partition or a sale, on appeal, we cannot reweigh the evidence. *Buck,* 833 N.E.2d at 116 (citing *Menard, Inc. v. Dage–MTI, Inc.,* 726 N.E.2d 1206, 1210 (Ind.2000), *reh'g denied* ). Consequently, we cannot say that the trial court's findings adopting Lady's view of the susceptibility to physical partition are clearly erroneous.[13] *See Gibbs,* 883 N.E.2d at 828–829.

For the foregoing reasons, we affirm the trial court's judgment of physical partition.

Affirmed.

MAY, J., and CRONE, J., concur.

---

The Appellants also examine *Buck v. Grube.* The Appellants cite the following language from *Buck:*

> Snell testified that if the lots were partitioned the number of buyers interested in the smaller tracts would be "traumatically thinner." According to Snell, a physical partition of the lots would require much cooperation between the owners of the separate lots to develop the individual lots because of issues with curb cuts, a wooded buffer, zoning, potential environmental problems, and access easements. Snell testified that although the Property could be partitioned, partitioning the Property would be "far more risky and less predictable...." Both Richard and Michael Grube testified that they believed partitioning the Property would harm the value of the Property. On the other hand, Carol testified that the Property could be split and that half of the property developed by a fast food chain with a double drive thru. Carol proposed "blend[ing]" the remaining portion of the Property with the neighboring development.

Appellants' Brief at 22–23 (quoting *Buck,* 833 N.E.2d at 115–116 (internal citations omitted)). In affirming the trial court's determination that the property could not be physically partitioned without damage to the owners, we held that "while the parties presented conflicting evidence regarding the Property's susceptibility of physical partition, on appeal, we cannot reweigh the evidence." *Id.* at 116. Thus, our holding in *Buck* reaffirms the trial court's discretion to weigh the circumstances which might have an impact on whether the owners of real estate might be damaged by its physical partition.

13. The Appellants also argue that the trial court "inappropriately concluded that a partition sale of Tract I would be a 'forced sale' resulting in less than fair market value for the property owners," "that a 'sheriff's sale provides a decent method by which value can be fixed[,]' *Arnold v. Melvin R. Hall, Inc.,* 496 N.E.2d 63, 65 (Ind.1986)," and that "[w]hatever the highest and best use of Tract I, a sale of the property under the statutory process is deemed to result in a sale for fair market value." Appellants' Brief at 11, 12, 19–21. Because we conclude that the trial court's determination that the Appellants would not be damaged by physical partition was not clearly erroneous, we need not address this argument.

In addition, the Appellants argue that the trial court applied an incorrect legal standard in rendering its judgment, and that "[t]he test is whether Mayfair (or, indeed, the other owners) would be damaged by a physical partition, not whether the Holliday [Heirs] would be damaged by a 'forced sale.'" *Id.* at 19. Specifically, the Appellants argue that paragraph 17 of the trial court's judgment, concluding that "a forced sale of the property would likely deprive the Holliday [Heirs] of the assemblage value of their share of [Tract I] ...." demonstrates that the trial court made its decision based on the potential damage to the Holliday Heirs from a sale, rather than applying the test set forth in Ind.Code § 32–17–4–12(a). *Id.* at 19. However, we note that in paragraph 11 the trial court concluded that "Mayfair would suffer no damage by reason of an in kind division because the value of Mayfair's 16–2/3% tenant-in-common interest is equal to the value of a part of [Tract I] equal to 16–2/3% of the land area....." Appellants' Appendix at 15. Thus, the trial court correctly applied Ind.Code § 32–17–4–12(a).