## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 29 2016, 9:08 am

*[signature]*

**CLERK**
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
| --- | --- |
| Matthew J. McGovern | Robin R. Craig |
| Anderson, Indiana | Evansville, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

In Re The Marriage Of:

Mark Steven Brown,

*Appellant-Respondent*,

　　　　v.

Julie Brown,

*Appellee-Petitioner*.

January 29, 2016

Court of Appeals Case No. 65A01-1502-DR-70

Appeal from the Posey Circuit Court

The Honorable Maurice O'Connor, Special Judge

Trial Court Cause No. 65C01-1004-DR-104

**Brown, Judge.**

[1] Mark Steven Brown ("Father") appeals from the trial court's order modifying his weekly child support payment. Father raises two issues which we revise and restate as:

    I.      Whether the court's findings regarding his weekly gross income are clearly erroneous; and

    II.     Whether the court abused its discretion in ordering him to pay attorney fees.

We reverse and remand.

### Facts and Procedural History

[2] Father and Julie Brown ("Mother") were married in 1993 and have three children. The trial court entered a final decree in August 2010 dissolving the parties' marriage which provided in part that the parties would have joint physical and legal custody of the children with each parent having custody approximately one-half of the time. The decree further provided that the parties agreed to equally provide the children's living and extracurricular expenses, Father would maintain health insurance on the children as long as he is able to do so at a reasonable rate, the parties would equally divide any uninsured medical expenses, and that if Father is not able to obtain health insurance at a reasonable rate then the parties would split the costs of insurance premiums equally. The decree also provided that neither Mother nor Father would pay child support and that "[t]his is based on the fact that both parties make substantially the same income, that the parties are sharing equally parenting

time and that the parties are also sharing equally any and all expenses associated with the minor children." Appellant's Appendix at 15.

[3] On October 20, 2011, Mother filed a petition to modify child custody, parenting time, and support alleging there had been a substantial and continuing change in circumstances and requesting attorney fees. On November 14, 2011, Father filed a petition to modify requesting a hearing. In August 2012, Mother's counsel sent Father a subpoena to produce "a copy of all of his taxes including all attachments for the years of 2009, 2010, and 2011, any exhibits that he plans to use in trial, his three most current pay stubs, any visitation log that he keeps, any bank loan applications, and the last 6 months bank statements." *Id.* at 46. Father produced the first page of his bank statements for four months, including statements with the statement dates of April 12, May 13, June 13, and July 15, 2012.

[4] The court held modification hearings on October 11, 2012, and March 8 and 13, 2013. The parties presented testimony and numerous exhibits related to a number of issues including the children's activities and medical needs and the income and employment of Mother and Father. The evidence related to Father's weekly gross income included certain tax records and bank statements and the testimony of Father, his business partner, and a union representative.

[5] Jason Farmer testified that he and Father are the sole shareholders and sole employees of Precision Glass and Glazing Inc., that the business was started in 2008, and that the business does commercial glass and glazing work. When

asked his typical work schedule, Farmer replied "[u]sually 6:00 to 3:30" and stated "that's our set schedule, Monday through Friday, that we actually work" and that "if there's somethin' goin' on you don't have to be there since we're owners. But that's our normal set schedule." Transcript at 275. He stated that Father typically arrives later on Wednesday and Friday mornings due to having his children, that Father has had to leave early sometimes for different things, and when asked how many times a month Father rearranges his work schedule, Farmer stated "there's definitely a good handful of times a month that he has to . . . maneuver different things for things that he's got going on. Maybe a half dozen a month, just guessing." *Id.* at 276. When asked if "you guys take off a little earlier on Friday afternoon," Farmer testified "our attempt is to Fridays are half days. And it just really depends. It works out good sometimes, other times if we're busy we work all day. So it's really up and down. But it's usually pretty flexible where we can get off early on Fridays." *Id.* at 276-277. When asked "[i]n a typical month how often are you off on Friday afternoon," Farmer replied "Oh, I would say usually probably three out of the four." *Id.* at 277. When asked "[h]ow do you keep track of who worked how many hours," he stated "[t]here's really no reason to. It's just the two of us." *Id.* at 282.

[6] Farmer further indicated that he and Father are members of a union, that their business adheres to the collective bargaining agreement of the union, and that there was a union pay scale. When asked the current union scale per hour for employees, Farmer answered "I believe it's $28.00 somethin'." *Id.* at 284. When asked "if [Father] sent an email to [Mother] saying that he normally has

forty hours of work in before Friday ever roles [sic] around, would you agree with that or disagree," Farmer replied "[k]inda depends, I mean, some days we work later than others, so . . . ," and when asked "[w]ell if he said he usually has forty hours in before Friday . . .," Farmer said "[i]f he said it, then I would say yes." *Id.* at 284-285. When asked "[w]hen you do take off early on Friday if it's not so busy, what time of the day do you leave," Farmer replied "[w]e try to leave by noon," and when asked "on the fourth Friday how long do you work," he said "[i]t depends. It can be till 2:00, till 3:00 or 4:00. It really just depends." *Id.* at 285. When asked "[i]s there ever weekend work," Farmer replied "[s]ometimes, not very often." *Id.* at 286.

[7] Father testified that he and Mother filed a joint tax return in 2009 and his wages for that year were $6,000. He further testified that his income in 2010 was $40,257, his income in 2011 was $33,514,[1] and that the average of those amounts is a pretty good representation of his annual income. The court admitted several of Father's tax records, including the 2009 joint tax return with attachments and tax statements for 2010 and 2011. Father's W-2 wage and tax statement for 2009 from Precision Glass and Glazing Inc. shows his wages were $6,000, the 2009 joint tax return shows income from a partnership of $16,704, and the attached Schedule E shows total income from Precision Glass and

---

[1] The record does not contain Father's 2011 tax return, but it does include his W-2 wage and tax statement for 2011 showing he received wages from his business of $1,500, and a completed State of Indiana estimated tax worksheet stating his total estimated income for 2011 as $39,691.

Glazing Inc. of $16,704.[2] Thus, according to the 2009 tax return, Father's income in 2009 was $22,704. Father's W-2 wage and tax statement for 2010 shows that he received wages from Precision Glass and Glazing Inc. of $3,000 in 2010, and his Schedule K-1 shows that he owned fifty percent of the business and that his ordinary business income for that year was $37,257. Thus, according to these tax statements, Father's income in 2010 was $40,257.[3]

[8] The court also admitted an affidavit of Eric Tasa, a business agent for Glaziers Local 1165, which stated that Father participates in the union as an owner, that Father pays dues of $33.50 per month and four percent of gross reported income from field work, and that income associated with office work or estimating work does not require payment of the four percent dues.

[9] Father testified that the union requires that he and Farmer submit a minimum of twenty hours whether or not they "actually worked twenty hours on job sites" and that they "pay four percent of whatever [they] turn in," which varies from month to month. *Id.* at 335. When asked if they typically submit just twenty hours, Father testified "[w]ell we weren't so much in the beginning, but that's what we've been basing it on now, unless we do actually work a lot of hours in the field" and that "[w]e weren't real clear on what we had to do and

---

[2] Schedule E shows nonpassive income of $21,158 and a Section 179 expense deduction of $4,454 from Form 4562 which relates to depreciation and amortization.

[3] When recalled at a later hearing held on May 1, 2014, and asked if he reported $31,818 as his income in 2011 and $2,161 as his income in 2010, Father answered affirmatively. It is unclear why these amounts differ from his original testimony and the tax statements discussed above. Also at this hearing, when asked how much he reported as his income in 2013, Father answered "roughly $26,000." Transcript at 591.

how we had to report it, just being new." *Id.* at 336. When asked his practice now, he answered: "Twenty hours unless we do work a lot of . . . I mean, most of the time it's twenty hours." *Id.*

[10] Later, when asked the last time he made $71,000 a year as indicated in one of Mother's worksheets,[4] Father testified that he never made that much in a year. When asked his typical wage when he worked full-time for someone else, Father testified that he worked a lot of overtime one year and made $55,000 and that the average was in the range of $40,000 to $45,000. Father agreed that the bank statement dated April 12, 2012, showed he had made four deposits which totaled approximately $5,277; the statement dated May 13, 2012 showed he had made four deposits which totaled $5,300; the statement dated June 13, 2012 showed he had made four deposits which totaled $4,600; the statement dated July 15, 2012 showed he had made five deposits which totaled $5,066; and that all of the deposits came from his ownership of his business or his payroll.[5] Father further agreed that the total of the deposits for the four-month period was $20,243, that four months covers about one-third of a year which is about seventeen weeks, and that this would correspond to an average weekly deposit of $1,190.

---

[4] Mother's Exhibits 1 and 2 contain child support worksheets which used figures for Father's weekly gross income of $1,560 and $1,071, respectively.

[5] The four bank statements together covered the period of March 13 through July 15, 2012.

[11]     When asked "do you remember sending . . . an email acknowledging to [Mother] that you usually have your forty hours in before Friday," Father replied "[y]es." *Id.* at 480. When later asked "[w]hen you say you have your forty hours in, are those all hours that you can bill clients for," Father responded "[a]bsolutely not" and testified: "If we're not physically on a job doing a job, it's not a billable job. So if I'm in the office, as this week I've been in the office all week, no billable work. But I've been there all week." *Id.* at 509. He indicated that there are months which are busier than others, and when asked "[a]nd these three months, April, May, would you consider those to be busy months," Father answered "[s]ince we've been in business, that time of year has been about the busiest time of year." *Id.* When asked if there are other months where his income is dramatically reduced, he answered affirmatively and stated that, since he started the business, he has had weeks where he had no paycheck and that the four months were not representative of a typical month. Father further indicated that his income tax returns were the most reflective of his income "overall throughout the year." *Id.* at 510. When asked what he would earn working for another employer, Father said he did not know an exact amount but "would say it would probably be in the range of high $40,000.00, $50,000.00, somewhere in that range." *Id.* Father also testified that his business did not provide him with a car or lodging or reimburse any of his meals.

[12]     The court also heard testimony from Eric Tasa that a collective bargaining agreement governs pay rates and that the wage for union workers is $26.78 per

hour, and time-and-a-half for any hours over forty hours a week. Tasa indicated that an owner/operator is not required to report all hours to the union. When asked if there were any rules with the union regarding how many hours must be reported, he stated: "Not that I can recall right now. There may be a guideline somewhere. I think at one timei [sic] was told it might be twenty hours. But I'm not exactly sure on that." *Id.* at 560. When asked "[s]o if I'm an owner/operator I could work sixty hours and pay myself for twenty-five," Tasa answered "[c]orrect." *Id.* When asked "[s]o I could voluntarily choose to treat myself worse than I treat my employees," Tasa replied affirmatively, and when asked "if I'm running a profitable business I'm gonna make it up in dividends or other ways," he answered "I suppose. I don't know how our business partners pay themselves." *Id.* at 561.

[13] Tasa also indicated that union glaziers are not guaranteed forty hours a week for fifty-two weeks a year, that work had been very slow for the last two or three years and consequently the union lost quite a bit of membership, and that he noticed work had started to pick up around the beginning of 2014. When asked "$26.78 [] sounds like a pretty good wage, but you're not guaranteed forty hours a week," Tasa testified "[c]orrect. And that's one of the reasons why we try to negotiate [a] good wage," and when asked "[y]ou're not workin' year round," he said "[r]ight. At least some of the people aren't." *Id.* at 563. Tasa stated he was not sure of the current average pay for a union glazier but that it could be between $40,000 and $50,000 depending on how much work is out there.

[14]     On May 1, 2013, Mother filed a submission of attorney fees which included an attached detailed billing statement showing a total billable amount of $12,635.64, and the court held additional hearings on August 26, 2013, and May 1, 2014. The parties introduced or filed several proposed child support worksheets. Father submitted three child support worksheets which used a figure of $680.48 as his weekly gross income to calculate his weekly support obligation. Mother submitted one worksheet which used $1,560 as Father's weekly gross income and a second worksheet which used $1,071. Her counsel stated that the figure in the first worksheet showed Father's income based on the hours he is actually working and that the amount coincides with Father's bank statement deposits, and that the figure in the second worksheet was Father's union rate for forty hours a week. Following the hearings, the parties filed proposed orders.

[15]     On January 23, 2015, the trial court entered an order that Mother have primary physical custody of the three children, that Father have certain parenting time, and that Father pay child support in the weekly amount of $313.09 based on a weekly income of $693 per week for Mother and $1,560 per week for Father. The court found that Mother had voluntarily given up a position with a former employer and $693 per week represented the higher of her 2010 and 2011 average earnings.

[16]     With respect to Father's weekly income, the court found that Father's current hourly rate is "twenty-eight something," an hour, that "$28.00 an hour at 40 hours a week would be $1,120.00 earned income," and that "[a]n additional 10

hours a week overtime would be an additional $420.00 per week of earned income. . . ." Appellant's Appendix at 158. The court also found that, doing the same work Father is doing now, working for any other employer in the union, he would be earning $1,560, but he earns substantially less because he chooses to continue working for himself and only pays himself for part of the work he performs. The court noted that Father received dividends throughout the year, that his bank statements indicate he "deposited a total of $20,243.56 of payroll or dividends into his personal account" during a four-month time period, and that this amount "represents a monthly average of $5,060.00, which is the amount [Father] would be earning doing the same union work for the same number of hours, if he worked for any other union employer." *Id.* at 159. The court also ordered Father to pay $300 per month to Mother for twelve months to be applied toward her attorney fees.

## *Discussion*

### I.

[17] The first issue is whether the trial court's determination of Father's weekly gross income for purposes of calculating his weekly child support obligation is clearly erroneous. "We place a 'strong emphasis on trial court discretion in determining child support obligations' and regularly acknowledge 'the principle that child support modifications will not be set aside unless they are clearly erroneous.'" *Lea v. Lea*, 691 N.E.2d 1214, 1217 (Ind. 1998) (quoting *Stultz v. Stultz*, 659 N.E.2d 125, 128 (Ind. 1995)). "Findings are clearly erroneous only when the record contains no facts to support them either directly or by

inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000), *reh'g denied*. We give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind. 1999).

[18]   Ind. Code § 31-16-8-1 governs modification of child support orders and provides in part:

> (a) Provisions of an order with respect to child support . . . may be modified or revoked.
>
> (b) Except as provided in section 2 of this chapter, modification may be made only:
>
>> (1) upon a showing of changed circumstances so substantial and continuing as to make the terms unreasonable; or
>>
>> (2) upon a showing that:
>>
>>> (A) a party has been ordered to pay an amount in child support that differs by more than twenty percent (20%) from the amount that would be ordered by applying the child support guidelines; and
>>>
>>> (B) the order requested to be modified or revoked was issued at least twelve (12) months before the petition requesting modification was filed.

[19] Father contests the trial court's determination of his weekly gross income for purposes of calculating his child support obligation. He argues that he never earned over $40,257 per year and yet the trial court found his income was $81,120 annually, that the court had no authority to impute income to him, that he pays himself for all work he performs, and that it is not the trial court's role to force him to change his job and give up his business in order to maximize his income. He maintains that the trial court's finding and Mother's assertion that he "works more than 40 billable hours per week have no foundation in evidence whatsoever and are clearly erroneous." Appellant's Brief at 18-19. He notes that the court found he pays himself forty hours per week through the union although there is no evidence of this and that he generally reports only twenty hours per week through the union.

[20] Father further contends that he receives income from both payroll and dividends from his ownership in his business, that his tax returns and quarterly estimated taxes reflect this, and that "[t]here is absolutely no evidence that [his] dividends and hourly income do not match all available income to him." *Id.* at 19. He states there is no evidence that all of his hours are billable and in fact there is evidence to the contrary, that much of his time is consumed with administrative and non-billable time, and he has had weeks where all of his hours were administrative and non-billable. He also notes the testimony of the union representative that glaziers are not guaranteed forty hours per week. Finally, Father argues that his bank statements do not support the court's determination of his weekly income and that the bank deposits averaged

approximately $1,125 per week, far below the $1,560 per week figure set by the court.

[21] Mother maintains that the record contains sufficient evidence to support the court's finding. She argues that Father's standard work hours are 6:00 a.m. to 3:30 p.m., Monday through Thursday with a half day on Friday, that Father admits he usually has worked forty hours before Friday, and that he sometimes works a full day on Friday and sometimes on weekends. Mother further argues that the deposits into Father's personal bank account "demonstrate annual earnings of over $60,000 per year, when he deposited at least $20,243 in a 4 month time period." Appellee's Brief at 18. She also argues that Father could have produced a full year's worth of bank statements to support his claim that the four-month time period was not indicative of his annual earnings.

[22] Indiana Child Support Guideline 3A(1) provides in part that "weekly gross income" is defined "as actual weekly gross income of the parent if employed to full capacity, potential income if unemployed or underemployed, and imputed income based upon 'in-kind' benefits" and that "[w]eekly gross income of each parent includes income from any source, except as excluded below, and includes, but is not limited to, income from salaries, wages, commissions, bonuses, overtime, partnership distributions, [and] dividends, . . . ."

[23] Indiana Child Support Guideline 3A(2) provides in part that weekly gross income "from self-employment, operation of a business, rent, and royalties is defined as gross receipts minus ordinary and necessary expenses," that weekly

gross income "from self-employment may differ from a determination of business income for tax purposes," and that "[e]xpense reimbursements or in-kind payments received by a parent in the course of employment, self-employment, or operation of a business should be counted as income if they are significant and reduce personal living expenses" and "[s]uch payments might include a company car, free housing, or reimbursed meals."

[24] The Commentary to Guideline 3A provides, with respect to self-employment, that calculating weekly gross income for the self-employed presents unique problems and calls for careful review of expenses, and that "[t]he principle involved is that actual expenses are deducted, and benefits that reduce living expenses (i.e. company cars, free lodging, reimbursed meals, etc.) should be included in whole or in part." Subsection 2(a) to Commentary to Guideline 3A.

[25] With respect to overtime and irregular income, the Commentary further provides that "[t]here are numerous forms of income that are irregular or nonguaranteed, which cause difficulty in accurately determining the gross income of a party" and that examples include "[o]vertime, commissions, bonuses, periodic partnership distributions, [and] voluntary extra work and extra hours." Subsection 2(b) to Commentary to Guideline 3A. It also provides that "[e]ach of the above items is sensitive to downturns in the economy," "[t]he fact that overtime, for example, has been consistent for three (3) years does not guarantee that it will continue in a poor economy," "it is not the intent of the Guidelines to require a party who has worked sixty (60) hour

weeks to continue doing so indefinitely just to meet a support obligation that is based on that higher level of earnings," and that "[c]are should be taken to set support based on dependable income, while at the same time providing children with the support to which they are entitled." *Id.*

[26] The trial court did not find, and the evidence to which the parties point does not show, that Father is voluntarily unemployed or underemployed.[6] *See* Support Guideline 3A(1) (stating in part that weekly gross income is defined as actual weekly gross income of the parent if employed to full capacity and potential income if unemployed or underemployed). In fact, Mother's position is that Father receives his union hourly rate for forty hours and time-and-a-half for an additional ten hours each week. Thus, we turn to the evidence of Father's actual earnings.

[27] The basis for the trial court's calculation of Father's weekly gross income was its Finding 14 that Father "testified that he typically works 50+ hours per week, however he only pays himself for 40 hours a week through the union." Appellant's Appendix at 158. Finding 14 is a verbatim recitation of a proposed finding contained in Mother's proposed findings of fact and conclusions of law. In Finding 15, the court found: "$28.00 an hour at 40 hours a week would be $1,120.00 earned income. An additional 10 hours a week overtime . . . would

---

[6] Under the Support Guidelines, if a court finds a parent is voluntarily unemployed or underemployed without just cause, it may calculate support based on the parent's potential income. *See* Ind. Child Support Guideline 3A(3); Commentary to Guideline 3A(2)(c).

be an additional $420.00 per week of earned income, so a weekly earned income of $1,560.00." *Id.* Finding 15 is also a verbatim recitation of Mother's proposed findings. The addition of $1,120 and $420 is $1,540, not $1,560. This mistake was copied in the court's findings from Mother's proposed findings. Further Mother does not direct us to evidence that Father works a weekly average of fifty or more hours at his union pay rate for fifty-two weeks per year and that all of those hours are billable.

[28] We turn to the evidence of the bank statements, tax records, and testimony admitted at the hearings. The record establishes that Father receives income from his business in two forms, namely, in the form of wages as an employee and in the form of distributions from the business by virtue of his ownership interest.

[29] Father's personal bank account statements dated April 12, May 13, June 13, and July 15, 2012, cover 124 days and show that Father received a total of $20,243.56, which equates to approximately $1,142.78 per week. Father agreed that the deposits constituted wage income and distributions from his business. This average weekly deposit is substantially less than the $1,560.[7] While the trial court acknowledges that the deposits represent a monthly average of $5,060, consistent with the bank statements admitted into evidence, it

---

[7] Mother argues in her brief that the bank deposits demonstrate Father had annual earnings of over $60,000 per year. We observe that annual earnings of $60,000 corresponds to weekly income which is substantially less than $1,560 per week.

nevertheless calculated Father's weekly income to be $1,560 which corresponds to an average monthly income of approximately $6,760.[8]

[30]    The tax records show that Father's income was $22,704 in 2009[9] and $40,257 in 2010,[10] and Father testified that his income in 2011 was $33,514. While income for tax purposes may differ from income for purposes of determining child support, we observe that Schedule E attached to the 2009 joint tax return shows that Father's income from his business of $16,704 accounted for an expense deduction of $4,454, that Mother does not argue that this expense was not a business expense or that Father received benefits from the business that reduced his living expenses, and that Father testified the business did not provide him with a vehicle, lodging, or meals. Father's tax records do not support the court's finding that Father's weekly gross income is $1,560.

[31]    We next turn to the testimony related to Father's work schedule and billable hours. Mother cites to various portions of the transcript for the proposition that Father works, and is paid for, over fifty hours of work each week; however, our review of the cited portions does not support this. Farmer's testimony, cited by Mother, is that the business's standard hours are 6:00 a.m. to 3:30 p.m. on Monday through Friday, Father typically arrives later on Wednesday and

---

[8] A weekly income of $1,560 per week amounts to $81,120 annually, which corresponds to $6,760 per month.

[9] The 2009 joint tax return shows Father had wages of $6,000 and distributions from his business of $16,704.

[10] Father's 2010 W-2 statement shows he had wages of $3,000 and his 2010 Schedule K-1 shows he had business income of $37,257.

Friday mornings he and Father leave by noon on Fridays and do so at least three Fridays a month, and that there was not often work on the weekends. Father testified that if he and Farmer were not physically on a job the hours were not billable, and that if he is in the office, the hours are not billable, and he has had weeks where he had no paycheck.

[32] Care should be taken to set support based on dependable income. *See* Subsection 2(b) to Commentary to Guideline 3A. The testimony was that not all of Father's work is billable, and the tax and bank records support this testimony. Further, there is no finding Father is voluntarily underemployed or that his income for support calculation purposes should include any potential income he could earn by working additional billable hours. *See Sandlin v. Sandlin*, 972 N.E.2d 371, 375 (Ind. Ct. App. 2012) (noting "the Guidelines do not require or encourage parents to make career decisions based strictly upon the size of potential paychecks, nor do the Guidelines require that parents work to their full economic potential" and that "[i]t is not our function . . . to approve or disapprove of the lifestyle of [parents] or their career choices and the means by which they choose to discharge their obligations in general") (citations omitted).

[33] Based upon the evidence set forth above and in the record, we conclude that the court's finding of Father's weekly gross income for purposes of calculating his child support obligation is clearly erroneous. We remand with instructions to recalculate Father's weekly gross income and to determine the amount of any credit to which Father may be entitled for any overpayment of support. *See*

*Sandlin*, 972 N.E.2d at 377 (noting there was no evidence suggesting the mother's income was $1,067 per week and that the only portion of the record where this number appeared was the mother's child support worksheet, and remanding with instructions to evaluate the evidence presented and determine the mother's income).

## II.

[34] The next issue is whether the trial court abused its discretion in ordering Father to pay attorney fees. Father argues that the attorney fee award was based upon a completely false evidentiary basis, and that the respective earning capacities of the parties are in relative parity. Mother argues the court did not abuse its discretion in ordering a modest award of attorney fees, that she incurred in excess of $12,500 in attorney fees prior to May 1, 2013 plus fees for work after that date, and it does not appear Father objected or responded to her submission on attorney fees in any manner.

[35] Pursuant to Ind. Code § 31-16-11-1, a trial court may periodically order a party to a child support proceeding to pay a reasonable amount for attorney fees. *See also* Ind. Code § 31-17-7-1 (same for proceedings for modification of custody and parenting time). The award of attorney fees is discretionary. *Whited v. Whited*, 859 N.E.2d 657, 665 (Ind. 2007). In assessing attorney fees, the trial court may consider such factors as the resources of the parties, the relative earning ability of the parties, and other factors that bear on the reasonableness of the award. *McGuire v. McGuire*, 880 N.E.2d 297, 303 (Ind. Ct. App. 2008).

Mother submitted a detailed billing statement showing she had incurred $12,635.64 in attorney fees prior to May 1, 2013.

[36] Because we reverse for a determination of Father's weekly gross income and weekly child support obligation based upon the evidence, the trial court should consider on remand whether Mother should be awarded attorney fees of $300 per month for twelve months or a lesser amount in light of the relative earning abilities of the parties and other factors that bear on the reasonableness of an award.

## Conclusion

[37] For the foregoing reasons, we reverse and remand for a determination of Father's weekly gross income and weekly child support obligation based upon the evidence and for consideration of Mother's request for attorney fees consistent with this opinion.

[38] Reversed and remanded.

Kirsch, J., and Mathias, J., concur.