FILED

Oct 30 2023, 8:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANTS

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEY FOR APPELLEES

Larry W. Morrison
Morrison Elder Law
Morgantown, Indiana

# I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jimmy A. McIntosh, and Cheryl McIntosh, | October 30, 2023 |
| *Appellants-Respondents,* | Court of Appeals Case No. 22A-PL-2522 |
| v. | Appeal from the Jennings Circuit Court |
| Roberta I. McIntosh, and Nilah K. Simmons as Power of Attorney for Roberta I. McIntosh, | The Honorable Ryan J. King, Special Judge |
| *Appellees-Petitioners.* | Trial Court Cause No. 40D01-2108-PL-105 |

**Opinion by Judge Kenworthy**
Judges Crone and Felix concur.

**Kenworthy, Judge.**

## Case Summary

Jimmy and Cheryl McIntosh appeal the trial court's judgment determining they violated the Indiana Senior Consumer Protection Act ("SCPA"),[1] raising the following issues for our review:

> 1. Are select trial court findings of fact and conclusions of law clearly erroneous?

> 2. Did the trial court apply the correct legal standard when determining Jimmy and Cheryl violated the SCPA?

> 3. Did the trial court improperly validate a warranty deed?

We affirm.

## Facts and Procedural History

At the time of trial, Roberta McIntosh was ninety-two years old. Around 2010, she was diagnosed with dementia. Due to her illness, Roberta is "pretty sharp sometimes and other times . . . she isn't." *Tr. Vol. 2* at 82. During the trial, Roberta explained she wanted her property to be split equally among her living children but could not remember signing several legal documents.

In 2017, Roberta fell twice, injuring herself both times. As a result, she needed more intensive care once she returned home. Because none of Roberta's other

---

[1] Ind. Code ch. 24-4.6-6 (2013).

living children could provide this level of care, Jimmy—Roberta's eldest son—and his wife Cheryl stepped up. By December 2017, both Jimmy and Cheryl had moved into Roberta's home to assist her.

[5] Around January 2018, Jimmy attempted to draft a warranty deed conveying ownership of Roberta's home in Commiskey, Indiana, to him and his wife. Although Roberta signed this deed, it was unrecordable because it lacked a complete legal description of the property to be deeded. About two and one-half years later, Jimmy turned to a professional for help. Attorney Bradley Kage drafted a Quitclaim Deed transferring ownership of Roberta's home to Jimmy and Cheryl. Upon learning of the deed, Nilah Simmons—one of Roberta's daughters—informed Jimmy that Roberta did not want to sign the Quitclaim Deed. After Jimmy was told this and that Roberta's Will had been lost, Nilah testified he got "very angry." *Id.* at 48. As Roberta was sitting in a chair, Jimmy stood over her, got in her face, and yelled "some pretty harsh things to her." *Id.* Jimmy told Roberta he would move out and the family would put her in a nursing home if she did not sign her house over to him and Cheryl. *See id.* at 48, 51. During this interaction, Roberta was "very stiff in her chair trying to get away from [Jimmy], and [Jimmy] wouldn't back away from her." *Id.* at 51. Nilah described the situation as "pretty scary." *Id.*

[6] On September 2, 2020, Jimmy and Cheryl took Roberta to Attorney Kage's office and the parties executed the Quitclaim Deed. The next day, Jimmy took the deed to the recorder's office to be recorded. That said, the Jennings County Recorder's Office did not record the Quitclaim Deed until November 2, 2020.

[7] Approximately a week after Roberta signed the Quitclaim Deed, she executed a Last Will and Testament. Then, on September 24, 2020, Roberta executed a Power of Attorney naming Nilah as her attorney in fact. And on October 9, 2020, Roberta executed a Warranty Deed. This Deed granted Roberta a life estate in her home and split the remainder equally among her living children. Nilah brought Roberta's Power of Attorney and the Warranty Deed to the Jennings County Recorder's Office to be recorded. Unbeknownst to Nilah, the Power of Attorney was not properly recorded. After Attorney Kage informed Nilah of this mistake, Nilah had the Power of Attorney properly recorded on April 19, 2021.

[8] On August 10, 2021, Roberta and Nilah—as Roberta's attorney in fact—filed a Petition to Quiet Title. The Petition alleged, among other things, Jimmy and Cheryl violated the SCPA and "either by mistake or error," the Jennings County Recorder's Office failed to record Roberta's Power of Attorney. *See Appellant's App. Vol. 2* at 14–16. Following a bench trial, the trial court entered specific findings of fact and conclusions of law. The trial court determined Jimmy and Cheryl violated the SCPA, Nilah filed Roberta's Power of Attorney in "substantial compliance" with statutory requirements, the Quitclaim Deed of November 2, 2020, was void, and the Warranty Deed of October 9, 2020, was the legally controlling instrument. *Id.* at 171. The trial court ordered Jimmy and Cheryl to pay Roberta's court costs and attorney's fees totaling $8,050. Jimmy and Cheryl now appeal. Additional facts are provided when necessary.

## 1. The Challenged Findings of Fact are Not Clearly Erroneous

[9] Jimmy and Cheryl argue several of the trial court's findings of fact are clearly erroneous.[2] When, as here, the trial court issues special findings of fact and conclusions of law *sua sponte* under Indiana Trial Rule 52(A), we apply a "two-tiered standard of review—first determining whether the evidence supports the findings and, if so, whether the findings support the judgment." *Town of Linden v. Birge*, 204 N.E.3d 229, 233 (Ind. 2023). "Any issue not covered by the findings is reviewed under the general judgment standard, meaning a reviewing court should affirm based on any legal theory supported by the evidence." *Steele-Giri v. Steele*, 51 N.E.3d 119, 123–24 (Ind. 2016).

[10] "We 'shall not set aside the findings or judgment unless [they are] clearly erroneous,' and we must give 'due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses.'" *Wysocki v. Johnson*, 18 N.E.3d 600, 603 (Ind. 2014) (quoting T.R. 52(A)). "Findings of fact are clearly erroneous only when they have no factual support in the record, and a judgment is clearly erroneous if it applies the wrong legal standard to properly found facts[.]" *Id.* at 603–04 (quotation and citations omitted). A finding or conclusion is clearly erroneous if we have a "firm conviction that a mistake has been made." *Fraley v. Minger*, 829 N.E.2d 476, 482 (Ind. 2005) (quoting *Yanoff*

---

[2] Jimmy and Cheryl also contend some conclusions of law are clearly erroneous because the trial court applied the incorrect legal standard. For clarity's sake, we will address these arguments in Section 2 of this opinion.

*v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997)). When a party does not challenge the trial court's findings, we must accept them as correct. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

***Findings 3(d), 3(e), and 3(f)***

[11] Jimmy and Cheryl argue the following findings are clearly erroneous:

> d. Jimmy McIntosh told Roberta McIntosh that she would have to be placed in a nursing home if she did not sign the property over to he [sic] and Cheryl.

> e. Jimmy McIntosh would yell in Roberta McIntosh's face. Jimmy McIntosh testified he got so close to Roberta McIntosh's face and yelled because she had difficulty hearing. Roberta McIntosh was able to hear and answer questions asked in the hearing by both attorneys. When asking questions, the attorneys were positioned three (3) to five (5) feet away from her. Roberta does have difficulty hearing consistent with her age.

> f. The Court finds that Roberta McIntosh would have been intimidated by someone yelling in her face, even if that person believed that somehow that was necessary and/or appropriate. This behavior was tantamount to coercion, undue influence, deception, and intimidation.

*Appellant's App. Vol. 2* at 158.

[12] At trial, Nilah testified Jimmy stood over Roberta, yelled at her, and threatened to put her in a nursing home if she did not sign the property over to him and his wife. Nilah described Roberta's frightened reaction to Jimmy's behavior. Jimmy and Cheryl contend Nilah's testimony was "contradicted by every other

witness who" viewed the interaction; thus, in their view, these findings are clearly erroneous. *Appellant's Br.* at 14. This is merely a request to reweigh evidence and judge witness credibility; tasks we cannot undertake. *See Wysocki*, 18 N.E.3d at 603. These findings are adequately supported by the record and are not clearly erroneous.

### Finding 3(k)

[13] Next Jimmy and Cheryl challenge Finding 3(k), which reads:

> k. Until Jimmy and Cheryl McIntosh asked Nilah Simmons to take Roberta McIntosh to sign the Quit Claim Deed, no one had been informed that Jimmy and Cheryl were currently trying to get Roberta McIntosh to sign the property over to them.

*Appellant's App. Vol. 2* at 158–59. At bottom, Jimmy and Cheryl challenge the finding because it "implies that the fact that Roberta was going to transfer the property to Jimmy and Cheryl was kept secret." *Appellant's Br.* at 16.

[14] Although Jimmy testified that he informed all his siblings about his and Cheryl's efforts to have Roberta sign over her property to them, several other family members testified they had never talked with Jimmy about his plans. The trial court was not required to accept Jimmy's self-serving testimony. And again, we may not reweigh evidence or judge witness credibility for ourselves. This finding is not clearly erroneous.

### Finding 3(n)

Finding 3(n) provides:

> n. Jimmy and Cheryl McIntosh prevented other family members from visiting Roberta McIntosh privately.

*Appellant's App. Vol. 2* at 159. Although Nilah met with Roberta privately, several other family members testified they could not speak one-on-one with Roberta when they visited her. *Tr. Vol. 2* at 68, 73. Because this finding has factual support in the record, we cannot say it is clearly erroneous.

### Finding 3(o)

Lastly, Jimmy and Cheryl challenge Finding 3(o), which reads:

> o. In January 2021, Jimmy and Cheryl McIntosh moved out of Roberta McIntosh's residence. Just two (2) months after recording the Quit Claim Deed.

*Appellant's App. Vol. 2* at 159. In effect, Jimmy and Cheryl argue the record shows they "did not leave voluntarily but under threat of arrest." *Appellant's Br.* at 17. Regardless, the trial court's finding is silent on the reason for Jimmy and Cheryl's departure. At its core, the finding has factual support in the record. Jimmy recorded the Quitclaim Deed in November 2020, and he and his wife concede they moved out of Roberta's home in January 2021. *See Appellant's Br.* at 17. This finding is not clearly erroneous.

## 2. The Trial Court Applied the Incorrect Legal Standard; Nonetheless, the Trial Court's Findings Adequately Support the Judgment

### A. The Correct Standard Under the SCPA is a Preponderance of the Evidence

[17]  Jimmy and Cheryl contend the trial court applied the incorrect legal standard when it found they violated the SCPA. More specifically, Jimmy and Cheryl argue it is inappropriate to apply the burden-shifting paradigm used in some undue influence cases to private actions under the SCPA because the SCPA contains damage and penalty provisions not available in a common-law undue influence action. *See Appellant's Br.* at 19. We agree.

[18]  Although we "defer substantially to findings of fact, we do not do so to conclusions of law." *Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000). Rather, we review the trial court's conclusions of law de novo. *Town of Linden*, 204 N.E.3d at 234. A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Wysocki*, 18 N.E.3d at 604.

[19]  Effective July 2013, the SCPA is designed to "simplify, clarify, and modernize the law concerning the ownership, control, and use of property or assets of senior consumers" and to "protect senior consumers from financial exploitation from persons, who by deception or intimidation, obtain control over the property or assets of a senior consumer."[3] I.C. § 24-4.6-6-2(b). A person commits financial exploitation of a senior consumer—thereby violating the SCPA—when the person "knowingly and by deception *or* intimidation obtains

---

[3] Under the SCPA, an individual who is at least sixty years old qualifies as a "senior consumer." I.C. § 24-4.6-6-3(5). Roberta—around ninety years old when the alleged violation occurred—is a senior consumer.

control over the property of a senior consumer *or* illegally uses the assets or resources of a senior consumer."[4]  I.C. § 24-4.6-6-4(a) (emphases added).  Relevant to the claim here, Indiana Code Section 24-4.6-6-3(2) defines "intimidation" as "the conduct or communication by a person directed toward a senior consumer informing or implying to the senior consumer that the senior consumer will be deprived of food and nutrition, shelter, prescribed medication, or medical care and treatment if the senior consumer does not comply with the person's demands."

[20] A senior consumer who is the victim of "financial exploitation" may bring a civil action against the person or persons who commit the unlawful act.  *See* I.C. § 24-4.6-6-5(a).  To recover, the senior consumer must prove—by a *preponderance of the evidence*—a person financially exploited him or her.  I.C. § 24-4.6-6-5(e).

[21] Here, the trial court relied, in part, on common law undue influence principles to determine Jimmy and Cheryl violated the SCPA.  Citing *Carlson v. Warren*, the trial court found Jimmy and Cheryl each had a confidential relationship with Roberta as a matter of law.  *Appellant's App. Vol. 2* at 168–69 (citing 878

---

[4] Indiana Code Section 24-4.6-6-4(b) provides: "The illegal use of the assets or resources of a senior consumer includes, but is not limited to, the misappropriation of those assets or resources by *undue influence*, breach of a fiduciary relationship, fraud, deception, extortion, intimidation, or use of the assets or resources contrary to law."  (emphasis added).  The Petition to Quiet Title, however, did not allege Jimmy and Cheryl illegally used Roberta's assets or resources.  Instead, the Petition contends Jimmy and Cheryl violated the SPCA by obtaining control over Roberta's property by intimidation.  Therefore, reliance on terms included in the statutory definition of illegal use, like undue influence, is misplaced.

N.E.2d 844, 851 (Ind. Ct. App. 2007)). Going further, the trial court presumed Jimmy and Cheryl exerted undue influence over Roberta. *Id.* at 169 ("[W]hen a [confidential relationship as a matter of law] exists and the fiduciary benefits from a questioned transaction, a presumption of undue influence arises and the burden shifts to the fiduciary to rebut the presumption.") (quoting *Carlson*, 878 N.E.2d at 851). Presuming undue influence, the trial court shifted the burden to Jimmy and Cheryl to prove by clear and convincing evidence the Quitclaim Deed was "completed in a fair and equitable manner." *Id.* at 170. Concluding Jimmy and Cheryl did not meet their burden, the trial court invalidated the Quitclaim Deed, finding it was obtained in violation of the SCPA. We believe the trial court clearly erred by shifting the burden of proof to Jimmy and Cheryl.

[22] Roberta and Nilah did not bring a common-law undue influence action. Instead, they alleged a violation of the SCPA. And Indiana Code Section 24-4.6-6-5(e) sets forth the burden of proof applicable to a private action brought under the SCPA—a preponderance of the evidence. By shifting the burden to Jimmy and Cheryl to rebut a presumption of undue influence by clear and convincing evidence, the trial court applied the wrong legal standard and clearly erred. *See Wysocki*, 18 N.E.3d at 604.

### B. Applying the Correct Legal Standard, the Trial Court's Findings Support Its Judgment

[23] Although the trial court applied the incorrect legal standard to make some of its conclusions of law, our review is not complete. Rather, we must determine

whether the trial court's findings support its judgment that Jimmy and Cheryl violated the SCPA under the appropriate burden of proof. Stated another way, based on the allegations in the Petition to Quiet Title, Roberta's claim under the SCPA succeeds if she can prove—by a preponderance of the evidence—Jimmy and Cheryl knowingly and by intimidation obtained control over her property.

[24] The evidence presented at trial established Roberta was ninety-two years old and suffered from dementia. The trial court heard testimony about two instances of Jimmy yelling in Roberta's face. During one instance, Jimmy stood over Roberta while she was seated and threatened to put her in a nursing home if she did not sign over her property to him and Cheryl. Nilah, a witness to this incident, described this mother-son interaction as "pretty scary" and noted Roberta was "very stiff in her chair trying to get away from [Jimmy], and [Jimmy] wouldn't back away from her." *Tr. Vol. 2* at 51. The trial court's findings support a judgment that Jimmy and Cheryl obtained control over Roberta's property knowingly and by informing or implying to Roberta she would be deprived of her shelter and the care she received from Jimmy and Cheryl if she did not comply with their wishes—*i.e.*, by intimidation. *See* I.C. § 24-4.6-6-3(2). Thus, we affirm the trial court's finding that Jimmy and Cheryl violated the SCPA.[5]

---

[5] Upon finding Jimmy and Cheryl violated the SCPA, the trial court ordered the pair to pay Roberta's court costs and attorney's fees. Indiana Code Section 24-4.6-6-5 sets forth several remedies a trial court may provide a senior consumer who is a victim of financial exploitation. Among the options available are

### 3. The Trial Court Did Not Err by Validating the Warranty Deed

[25] Jimmy and Cheryl contend the trial court erred by finding the October Warranty Deed valid because it was recorded before Roberta's Power of Attorney. Essentially, Jimmy and Cheryl contend substantial compliance with the requirements of Indiana Code Section 30-5-3-3 is not sufficient.

[26] Generally, an attorney in fact may act under a power of attorney without recording the power of attorney with the county recorder. *See* I.C. § 30-5-3-3(a). But an attorney in fact must record a power of attorney authorizing the execution of a document that must be recorded—*e.g.*, a deed—*before* presenting that document for recording. I.C. § 30-5-3-3(b). A county recorder may not accept a document for recording if the document was "executed . . . and is presented . . . by an attorney in fact whose power of attorney is unrecorded." I.C. § 30-5-3-3(c). And a document presented by an attorney in fact for recording must "reference the book and page or instrument number where the instrument creating the power of attorney is recorded before the document may be presented by the attorney in fact." I.C. § 30-5-3-3(e).

[27] The parties agree these statutory requirements were not met. Roberta's Power of Attorney naming Nilah as her attorney in fact was not recorded until April 19, 2021—about six months after Nilah first attempted to record the Power of

---

reasonable attorney's fees. *See* I.C. § 24-4.6-6-5(d). Accordingly, we affirm the trial court's monetary judgment in the amount of $8,050 in favor of Roberta against Jimmy and Cheryl.

Attorney and Warranty Deed. But what more was Nilah to do? Nilah brought both the Power of Attorney and the Warranty Deed to the Jennings County Recorder's Office on October 9, 2020. Nilah presented both documents to the Recorder's Office and left believing she had taken all the steps necessary to have each document properly recorded. Once Attorney Kage informed her that the Recorder had failed to properly record the Power of Attorney, Nilah returned to the Recorder's Office within days to correct the error. As the trial court found, Nilah "performed all acts necessary to appropriately record the Warranty Deed and continued to fulfill her duties as Power of Attorney once notified that there had been a mistake." *Appellant's App. Vol. 2* at 166. The trial court also explained the Recorder's Office failed to properly record the Power of Attorney due to "oversight, mistake, or error." *Id.* at 167. Put another way, we discern no fault by Nilah and conclude—based on the circumstances of this case—she took all necessary steps to comply with the statutory requirements. Thus, the trial court did not err by validating the Warranty Deed dated October 9, 2020.

## Conclusion

[28] Although the trial court, in part, applied the incorrect legal standard, sufficient findings support the trial court's determination that Jimmy and Cheryl violated the SCPA. And the trial court did not err by validating the Warranty Deed executed October 9, 2020. Accordingly, we affirm.

[29] Affirmed.

Crone, J., and Felix, J., concur.